BERTHA SEE, Plaintiff-Appellant, v. WABASH RAILROAD COMPANY, a Corporation, and ANDREW J. RICHEY, Defendants-Respondents, No. 41865—242 S. W. (2d) 15.

Division Two, September 10, 1951.

*Ninian M. Edwards* and *N. Murry Edwards* for appellant.

*Albert E. Schoenbeck* for respondent Wabash Railroad Company and *Eugene S. Davis* for respondent Andrew J. Richey.

492

■■■

■ LEEDY, P. J.—Action by Bertha See against Wabash Railroad Company and Andrew J. Richey, its locomotive engineer, to recover for the alleged wrongful death of her husband, Alva, resulting from a truck-train collision at a railroad crossing. Verdict and judgment for defendants, and plaintiff appeals.

Abandoning all charges of primary negligence, plaintiff submitted the case solely upon humanitarian negligence in failing to slacken speed or to sound a timely and adequate warning. Her assignments on this appeal relate exclusively to the giving of certain of defendants' instructions. Defendants (as respondents) contend, first, that any error in the instructions was harmless for the reason plaintiff failed to make a case for the jury, and, therefore, the court erred in overruling their (joint) motion for a directed verdict.

■ Dismissal of this appeal would be justified for failure of the appellant to comply with those provisions of rule 1.08 respecting a statement of the facts. Subsection (a) of that rule requires that the brief for appellant shall contain: "(2) A fair and concise statement of the facts without argument." Subsection (b), elaborating on the subject, says this: "The fair and concise statement of the facts shall be in the form of a statement of the facts relevant to the questions presented for determination. * * * If desired, such statement may be followed by a statement of testimony of each witness relevant to the points presented." Here we have no "statement of the facts" as such. There is set out, under the caption "The Evidence," what purports to be a resume of the testimony of each witness. This is permissible, under paragraph (b), as to facts relevant to the points presented, but only where the same *follows* the fair and concise statement required by paragraph (a). But we do not dismiss the appeal in this particular instance because defendants, apparently not satisfied with plaintiff's statement, made their own, and in doing so offended as much as had plaintiff.

Apparently the only eyewitness to the collision was the individual defendant, ■■■ Richey. As nearly as we are able to understand plaintiff's position, she relies mainly upon Richey's extra-judicial admissions (which were inconsistent with his position at the trial) and the favorable portions of his testimony at the trial, and inferences therefrom. On the other hand, defendants' brief makes no reference whatever to the most damaging of these admissions (that the truck did not stop, but "kept on"), but argues the question of submissibility from the standpoint of the evidence most favorable to defendants, as developed at the trial. As no distinction is sought to be drawn as between the corporate and individual defendants touching

the submissibility of plaintiff's case, and in view of the briefs on the question, we have concluded to go no further than to determine whether plaintiff made a case against either defendant on either of the alternative charges mentioned. In doing so, the evidence in defendants' favor is to be disregarded, and only that favorable to plaintiff, together with any and all reasonable inferences therefrom, will be considered. Plaintiff is, of course, entitled to the aid of any evidence offered by defendants which is favorable to her, and not in conflict with the fundamental theory of her case.

Plaintiff's husband was killed when the 1935, 1-½ ton, short wheel base, Chevrolet dump truck he was driving westwardly was struck by a northbound Wabash passenger train at Porter's crossing, a public crossing located in the country about three or four miles north of Montgomery City, Mo. The casualty occurred about 10:30 A. M., on April 17, 1948. The sun was shining, and the roads and track were dry. The train, a local, running about 25 minutes late, consisted of an engine, tender, two baggage cars, and one coach, its over-all length being about 300 feet. Deceased, 69 years of age, was a junk dealer. He used a hearing aid. It was found (broken) on his person after the collision. A son testified that his father's hearing with the hearing aid was very good. Another witness testified that about two weeks before the accident, deceased was having trouble with his hearing aid, and that he had gotten a new one a day or two before he was killed; that the new one was "working fine," and that deceased could hear "good" with it, and carry on a normal conversation. His son testified he last saw his father alive a little after 10 A. M., on the morning in question, as he was driving north out of Montgomery City on State Highway No. 19 in his truck, the windows of which were open at that time.

The railroad track and the state highway just mentioned which parallels it on the east will be referred to as running north and south. The intersecting gravel road, known as Porter's road, whereon the collision took place, will be referred to as running east and west. The plat shows there is some slight deviation in these directions, but for practical purposes it is not inaccurate to so designate them. The gravel road intersects the state highway a short distance east of the crossing. The paved portion of the state highway is a 20-foot concrete slab, and the distance between the west edge of the concrete slab and the center of the track (measured at right angles) is 68.2 feet. The railroad and the state highway are substantially level, but there is a difference in elevation between the two, the railroad being much higher. Plaintiff's evidence tended to show this difference to be 8 or 9 feet, whereas defendant's civil engineer testified it was 6.7 feet. The gravel road is narrow at the crossing (two vehicles cannot cross at the same time), but a short distance to the east thereof its width increases, by sharply opening or flaring out, both to the north and

south, so that at the point where it connects with the state highway it is approximately 100 feet in width. Viewed on the plat, the gravel portion of this junction has the appearance of a cross-section of a funnel, the narrow part at the crossing resembling the tube, and the flared out portion, the conical part. After going over the crossing, the gravel road extends on to the west, and on that side, too, its elevation is lower than that of the railroad. Defendants' evidence was to the effect it was 3.7 feet lower at a point 50 feet west of the track. It was further shown that not until a motorist approaching the crossing from the east is half way up the ramp or incline can he see over ▮▮▮ the railroad embankment, and observe traffic approaching from the opposite direction.

From the southernmost tip of the gravel (of Porter's road) along the west edge of the concrete slab north and westwardly along the vehicular course up to the crossing is about 80 feet. Starting 66 feet south of the crossing, both the railroad and the state highway curve to the east. This curve is gradual (1%), and from the photographs it appears that the distance between the track and highway continues to be uniform. Plaintiff's own evidence shows that visibility at the crossing is good, it being uncontroverted that for a distance of more than one-half a mile south of the crossing there is nothing (other than telegraph poles) to obstruct the view.

Several witnesses called by plaintiff testified to the effect that no whistle was sounded, or other alarm given prior to the collision. Defendant Richey, testifying for defendants, stated that from his seat on the right (or east) side of the engine (some 12 feet above the rails) he could see the crossing a mile and a half away, as he approached it from the south; that he first saw the truck (as it was proceeding north along the state highway) when it started to turn left off of the slab and onto the gravel at the extreme south end of the intersection, a point referred to above as being about 80 feet from the crossing. He estimated that the train was then 400 feet south of the crossing. He fixed its speed as from 65 to 68 m.p.h., the figure shown by the speedometer which he observed about the time he saw the truck. He estimated the speed of the truck to be 4 or 5 m.p.h.

His version at the trial (parts of which are inconsistent with his prior statements) was to the further effect that the truck proceeded along the gravel road toward the crossing at the same rate of speed, and stopped when within 8 or 10 feet of the near rail; that he "thought he was going to stay there until we crossed, but he started up [when the front end of the engine was 90 or 100 feet from the crossing], and when I seen him start to go across I grabbed the brake and put it in emergency. * * * As soon as I seen him start, I figured he couldn't make it." The collision followed, and the train came to a stop with the rear end about 800 feet north of the crossing. He testified that he began to whistle for the crossing at the whistling

post a quarter of a mile south of the crossing, and he continued to whistle until the engine struck the truck. Asked on cross-examination if, from the point 400 feet south of the crossing where he first saw the truck, he continued "to go 65 to 68 miles an hour down to within 90 or 100 feet of Porter's crossing," the witness stated, "Well, * * * I was a-watching that car and I didn't look at the speedometer at that time. I was watching *because I was wondering what the man was going to do.*" It was his judgment that there was no appreciable deceleration in the speed of the train after applying the emergency brake and before the train reached the crossing.

The prior inconsistent statements on the part of the engineer which plaintiff invokes are:

(1) That part of his conversation with the sheriff of the county (within half an hour after the collision) to the effect that he saw this man on the crossing and thought he was going to stop *but he did not;* and

(2) His testimony before the coroner's inquest, reduced to writing and signed by him, as follows: "I was coming up to the crossing running about 65 to 70 M. P. H. *I noticed the truck and called to the fireman and said the truck wouldn't make it.* I had been whistling from before the whistle post; but *he did not take notice—but kept on. He never looked and never acted like it.* He came up over the grade and was hit in almost center."

All of the engineer's estimates of locations, distances and speed, as given at the trial, cannot be accurate; otherwise, the collision simply could not have happened. At 68 m.p.h., the train traveled approximately 99 feet per second, so that at a point 400 feet south of the crossing (where he said he first observed the truck), the engine was 4 seconds away from the crossing. At 5 m.p.h., the truck traveled 7.3 feet per second, so that at the point ■■■ at which the engineer said he saw it turn off of the slab and onto the gravel (80 feet from the crossing), the truck was approximately 11 seconds away from the crossing. The train was 300 feet long, so even the rear end would have cleared 4 seconds before the truck, traveling at 5 m.p.h., could have gotten there. The jury was, therefore, at liberty to reject the testimony of the engineer that the engine was 400 feet south of the crossing when he first observed the truck, and that he was whistling, and to accept his testimony as to its speed and that of the truck and the latter's position when he first saw it. This means that the jury might reasonably have found that the train was about 1100 feet south of the crossing (the same time-distance from the crossing as the truck) when the engineer saw the truck turn off of the state highway and onto the gravel, and in the intervening 11 seconds before the collision, the truck, climbing the steep grade (approximately 10% even under defendants' evidence), traveled 80 feet at an undiminished speed; that the engineer called to the fireman and said the truck wouldn't

make it; that the driver did not stop, and did not take notice but kept on; "he never looked and never acted like it." Thus the jury could reasonably find See's obliviousness and his intention to go on across were apparent to the engineer throughout substantially the whole course the truck traveled after turning off of the slab. We take judicial notice that such a truck, traveling up a steep grade at the speed here involved, can be stopped almost instantly. Also, that the whistle or bell could have been sounded in a second or less. Chawkley v. Wabash R. Co., 317 Mo. 782, 797, 297 S. W. 20, 24, where it was said: "It must be remembered that men in charge of railway trains are trained to quick observation and quick action. They do not have to stop and think of the thing to be done. Action follows the impression, automatic and instantaneous; otherwise, they could not hold their jobs." "To be free from negligence under the humanitarian doctrine one must act on reasonable appearances at a time when action would be effective." Perkins v. Terminal R. Ass'n, 340 Mo. 868, 878, 102 S. W. 2d 915, 919. Under the facts in evidence and the reasonable inferences to be drawn therefrom, we hold the question of whether, by sounding a warning after the peril was discovered or discoverable, the collision could have been averted was for the jury.

The first point relied on for reversal is that the court erred in giving defendants' sole cause instruction (No. 5), reading as follows:

"The Court instructs the jury that if you find and believe from the evidence that the sole cause of the collision mentioned in evidence and the death of the plaintiff's husband, Alva See, was the negligence, if any, of said Alva See in failing to look or listen for the approach of a train, if he did so fail, or in failing to stop the truck he was driving before the collision with the train, if he could have done so by exercising the highest degree of care in operating said truck, and that defendants were not guilty of any negligence as defined in other instructions given you herein, then plaintiff cannot recover and your verdict should be for the defendants."

This same form of sole cause instruction was considered by the court en banc, and held erroneous in Janssens v. Thompson, 360 Mo. 351, 356-362, 228 S. W. 2d 743, 746-750. It was there condemned as permitting a finding of deceased's antecedent contributory negligence, and as an improper and insufficient hypothesization of the facts of the actual situation shown by the evidence. At one place in the opinion it was said that the instruction "certainly does not fit the facts (even of defendant's evidence) of this humanitarian negligence case." Seizing on this language, defendants seek to distinguish this case from the Janssens case on the ground that here "the instruction did certainly fit the facts of defendants' case," the argument in this connection being that "the decedent did not enter into a position of imminent peril until he started his dump truck forward again. Then and only then did it appear that See was oblivious to the approach of

the train." We think it obvious that the ▮▮▮ submission of deceased's failure "to look or listen for the approach of a train," or failure "to stop the truck he was driving before the collision with the train" is insufficient, under the rule in the Janssens case, as an hypothesization of the fact (shown by defendants' evidence) that See did start his dump truck forward again.

Plaintiff's recovery instructions, Nos. 1 and 2, permitted recovery under the humanity rule "even though you may further find and believe from the evidence that Alva See was guilty of negligence which directly contributed to cause the collision and his injuries and death." The presence of this tail is urged as the other reason for distinguishing the Janssens case. While it does not appear from the face of the Janssens opinion, plaintiff's recovery instruction there did, in fact, contain such a tail. We think the cases are not distinguishable, and that the Janssens case is controlling.

▮ We consider in this same connection plaintiff's assignment of error in the giving of defendants' instruction No. 6, which told the jury "that under the law of the State of Missouri persons operating motor vehicles on the public roads and highways of this state must exercise the highest degree of care while so doing. By the term 'highest degree of care' as used in these instructions is meant such care as a very careful and a very prudent person would exercise under the same or similar circumstances." The only complaint as to the form of the instruction is that it is a mere declaration of abstract principles applicable to driving motor vehicles. Of course, it does not call for the application of such principles to the facts of the case as the jury might find them to be. In other words, it does not submit in what particulars See may have failed to exercise the highest degree of care. And it is charged that the instruction injects a false issue and was dangerous and harmful for that reason. If, as we have held, following the Janssens case, the sole cause instruction was erroneous as permitting a finding of deceased's contributory negligence, then it must follow that this instruction must be condemned as multiplying that error. This because the only other place in the instructions that the term "highest degree of care" is used is in the sole cause instruction, and instruction No. 6 speaks of "the term 'highest degree of care' as used in these instructions." The effect of thus pointedly referring the jury to the erroneous sole cause instruction for guidance in applying No. 6 was to add confusion to an already confused situation.

▮ Plaintiff's criticism of instruction No. 3 is not well founded. It told the jury that defendants were not required to slacken speed or sound a warning "until the moment when, by the exercise of ordinary care, it should have appeared to the defendants that the plaintiff's husband, Alva See, was in a position of imminent peril," and further "that said Alva See was not in a position of imminent

peril until he reached a position where under the circumstances *the engineer and fireman* could and should have seen the truck *and realized that the driver would not or could not stop the truck or change its course before coming onto the railroad crossing into the path of the* train.'' Plaintiff complains of the portions we have italicized. First, because there was no evidentiary basis for submitting a change of course; and, second, because it erroneously limited the duty of the enginemen in that it required that they have actual knowledge that See would not stop before going on the track before they were required to act in any way to prevent the collision.

The first contention is based on the assertion that the photographs show there were deep depressions on each side of the road approaching the crossing, and hence there was no evidence that it was possible for the deceased to have changed his course of travel and thereby avoided coming onto the crossing and into the collision. The appearance of the crossing has been rather fully described, and from the photographs of it we fail to discern any such deep depressions on the sides of the road as to have made it impossible or impracticable for the ▮ driver to have diverted the course of his truck, even in the last few feet before coming within the overhang of the engine. The instruction submits constructive seeing in no uncertain language—''could and should have seen.'' Would the jury be likely to understand, then, that by the use of the conjunction ''and,'' with which those words are connected with the verb ''realized,'' that the latter meant actual knowledge? We think not. While the proposition could have been more aptly stated, it does not follow that prejudice resulted to plaintiff. We must disallow the further contention that the instruction unduly restricts the danger zone by limiting it to the point where See came ''onto the railroad crossing into the path of the train.'' On the contrary, it places upon defendants the duty of acting as of that ''moment when, by the exercise of ordinary care, *it should have appeared* to defendants * * * that See was in a position of imminent peril.''

▮ Plaintiff also assails defendants' instruction No. 4, which is in substantially the same form as instruction No. 4 in the Janssens case, and there held not to be erroneous. Plaintiff's criticism of it ignores the qualification which the instruction appends to the right of defendants to assume that an approaching truck would stop, i. e., ''until they saw or should have seen that the truck would not stop, and was in a position of peril.'' The cases relied on are, for this reason, not in point.

▮ Defendants' instruction No. 8 on burden of proof told the jury at one place that ''Preponderance of the evidence as here used means evidence which you think is more worthy of belief than that offered *by defendants.*'' This is inaccurate and misleading. Sub-

stitution of the words "in opposition thereto" for those we have italicized would have rendered the definition unobjectionable. Rouchene v. Gamble Const. Co., 338 Mo. 123, 135, 89 S. W. 2d 58, 63.

Judgment reversed, and cause remanded. All concur.