243 S.W.2d 625 (1951)
FOSSETT
v.
FOSSETT (two cases).
Nos. 7005, 7006.
Springfield Court of Appeals, Missouri.
November 2, 1951.
*626 Lincoln, Lincoln, Haseltine & Forehand, H. T. Lincoln and Wallace N. Springer, Jr., all of Springfield, for appellant-respondent, Ruth Fossett.
Luther W. Adamson, Kansas City, for respondent-appellant, Hal. D. Fossett.
VANDEVENTER, Presiding Judge.
This is a cross-appeal from a divorce action tried in the circuit court of Lawrence County, Missouri. It was tried upon an amended petition, answer and cross-bill and reply. After a lengthy trial, the trial court dismissed the amended petition and cross-bill, giving neither party a divorce.
The amended petition alleged indignities. Briefly, they were that defendant was quarrelsome, jealous, gossipy, continually stirring up trouble between friends, relatives and business acquaintances and repeating slanderous rumors, to the great humiliation of plaintiff. That she was dominating and bossy toward the plaintiff in his business, that she deliberately disrupted the cordial relationship between plaintiff and their son, an only child; that she, and her son, acting under her instructions, secretly removed and confiscated large sums of money and personal property belonging to the plaintiff; that defendant on many occasions while in a rage and anger has assaulted this plaintiff, at times with a revolver, forced him to flee, and at another time assaulted him with a knife. That she secretly and designedly administered drugs to plaintiff in his food and that he became ill because of such action; that she constantly and falsely accused him of acts of immorality and that she manufactured and circulated stories that plaintiff had accused her of immoral acts with a number of local men. That for weeks and months she went from place to place spreading stories that plaintiff was mentally ill and immoral and that on the 4th day of March, 1950, pursuant to a criminal conspiracy between herself and others, she administered drugs to plaintiff, rendered him unconscious, transported him to St. Louis and illegally confined him from March 4th until the 13th day of May; and thereafter by a false, fraudulent and abortive action in court, attempted to destroy the plaintiff by having him declared insane.
To these charges an answer was filed denying all of them except defendant admitted having the plaintiff taken to St. Louis for hospitalization and this she did because she, in good faith, believed that plaintiff was in need of medical care and hospitalization and that he was dangerously ill and must be confined, not only for his own safety but for the safety of others and that she only began the incompetency proceeding after plaintiff had refused to submit to hospitalization; that these acts were done upon the advice of counsel and of doctors, she believing that plaintiff's actions were caused by his illness, and that "plaintiff did need hospitalization for his own protection and for the protection of others."
The cross-bill after alleging the marriage and separation, asks for a divorce upon the following grounds: "That plaintiff grew cold and indifferent; that plaintiff was extremely quarrelsome; that plaintiff became violently jealous without cause of defendant; that on numerous occasions he assaulted this defendant; that on numerous occasions falsely accused this defendant of associating with other men; that he attempted to interfere with defendant's job as postmaster and threatened on numerous occasions to have her dismissed from said position; that on numerous occasions plaintiff threatened to kill this defendant, *627 and did assault defendant with deadly weapons; that on numerous occasions plaintiff falsely accused defendant of taking large sums of money from plaintiff; that on numerous occasions plaintiff falsely accused this defendant of criminal acts against plaintiff; that plaintiff has accused this defendant of being insane; that plaintiff has falsely accused this defendant of stirring up trouble, making unwise investments, breaking up a father and son relationship between plaintiff and Max Fossett; that said treatment grew steadily worse until defendant could no longer live with plaintiff and separated from him on account thereof."
The reply denied the above quoted matters.
The record in this case is voluminous, the trial lasted several days and much of the testimony related to the property that had been accumulated by plaintiff and defendant through more than thirty years of married life. During most of this time, plaintiff had been engaged in operating a furniture store and an undertaking establishment in Mt. Vernon, Missouri. Plaintiff testified that during all of their married life, defendant had been jealous, fussy, gossipy and accusatory; that this conduct commenced the second night after their marriage; that she would argue with his partners in the furniture business, accusing them of incompetency and thereby disrupting an otherwise amicable partnership relationship. That she was dictatorial about the conduct of the furniture and undertaking business, even to the point of carrying her personal grudges "down to the grave diggers". That plaintiff remonstrated with defendant but to no avail. That in 1932 she took a government position in what was then known as C.W. A., at which time plaintiff and defendant hired a maid (one Lela Rhodes) to take care of their house. This maid stayed with them from 1932 until July, 1949, cooking the meals, doing the housework and since 1932, defendant never did any housework or cooked any meals for the plaintiff; that she refused to tell plaintiff what salary, if any, she was drawing from the government, and did not contribute anything toward payment of household expenses. She was constantly interfering with plaintiff's business, made trips away from their home, telling the friends of plaintiff that he was mentally incompetent.
Plaintiff further testified that defendant would not permit him to listen to radio broadcasts of ball games, football games or prize fights, until he finally took the radio into the garage where he could listen undisturbed. That at one time she came to the store where plaintiff was working, swore at him, screamed at him, pulled her shoe off and beat herself on the head with the heel of it, and pulled out some wisps of her hair because she had heard that he had sold something on time or had been too long on an ambulance trip. She constantly interrogated him about various women.
In 1943 through his efforts, defendant was appointed postmaster at Mt. Vernon, a position she has held continually since that time, and which pays a salary of more than $4,000 per year. After being appointed postmaster, she had never done any work in the undertaking establishment or furniture store because of her government duties and that she did very little work prior to that time. She was continually quarreling with postal employees and gossiping about them to plaintiff to his embarrassment and humiliation. That defendant became very jealous because plaintiff was nice to their daughter-in-law and finally turned her against the plaintiff. After that, defendant tried to separate her son and daughter-in-law. When plaintiff didn't mow the yard, defendant would quarrel at him for not doing so, and when he did mow it, she would quarrel at him and tell him he was not able to do it. During all this time, she was continually using the vilest kind of profanity when talking to him.
She was continually endeavoring to get plaintiff to turn all his money and property over to her and their son, Max Fossett. At frequent intervals, she would leave home and remain away over night, offering no explanation. After she was appointed postmistress, she would not tell the plaintiff *628 what her salary was but informed him that it wasn't any of his business. None of her salary ever went into his accounts. Defendant's personal bills during all these years were paid from plaintiff's store account. Plaintiff further testified that for a period of time, he would become ill after eating meals prepared by defendant and that at one time she tried to get him to take two tablets and upon examination of them, he discovered that they were bichloride of mercury, a deadly poison. Once she threatened to burn the house down. At another time, when he was listening at the radio, she seized a revolver and said "I'll shoot a hole through you," while she was pointing the gun at him. The gun was loaded so plaintiff fled the premises, after being called vile and vulgar names.
At several times she had thrown bricks at him. She continually told him he was a sick man and should see a doctor. Plaintiff testified that one night, about July 1948, while he was lying on the bed listening to a radio broadcast of a prize fight, that she came into the room with a butcher knife, nudged him in the side with her knee and with the knife struck at him, cutting two holes in the mattress. She told him she was going to cut his feet off and kill him. One hole was about 16 inches long and the other six inches. The pistol that she had drawn on him, the butcher knife and mattress were introduced in evidence. She told him at the time, she was tired of hearing the radio. In September, 1949, she left the plaintiff and stayed away until the 14th or 15th of December, at which time she came back and they lived together as man and wife until March 4th, 1950.
One night when it was about time to retire, defendant made plaintiff a cup of ovaltine to drink, which had been his habit before going to bed. He couldn't taste anything in it, but immediately upon drinking it, he became unconscious. He later discovered that an opiate had been administered to him in the ovaltine. Later he heard his wife say that this was her first attempt to administer knock out drops to him.
On the 24th or 25th of February, 1950, plaintiff and defendant went to St. Louis. Defendant told him that she was very ill, thought she had cancer and wanted to have someone examine her. When they got to St. Louis, she left him and was gone a considerable period of time. She returned about 7 o'clock in the evening and plaintiff was in bed. She told him she had got him some sleeping tablets and tried to get him to take two capsules. She told him that was about the right amount for him as she sometimes took as many as three of them at night. The capsules were yellowish in color on one end and black on the other. He had never seen any like them before and refused to take them.
On March 4th, at their home, plaintiff had gone to bed and in about an hour defendant came in. She put on her night clothes and asked him if he wanted a cup of ovaltine. He told her he did not, that he was tired but she insisted on making some. He took one glass of it and she took the other. He noticed a little difference in the color but thought nothing of it. He drank his ovaltine and that is the last he remembered. When he woke up, light was shining in his face, he was in an ambulance and a doctor was standing over him with a hypodermic needle. He was informed that this was "Dr. Brown" and his nurse from Springfield and they were in an ambulance. Defendant told him to lie still, that he had had a heart attack. The Doctor gave him an injection in the arm and he again went to sleep. He woke up again somewhere on the way to St. Louis, was given another hypodermic injection and the next thing he knew, he woke up in a St. Louis Hospital for the mentally ill. He stayed in one particular section of the hospital for about 13 days, associating with maniacs, then was removed to another section of the hospital, where his associates were only idiots. He was subjected to an operation while in the hospital by which some spinal fluid was taken from him. This was very painful and caused a pain in his back for a long time. He was given no medicine, not even an aspirin tablet, during his 69 days in the hospital. He was always under close supervision by nurses and guards. During this period of incarceration, defendant came to *629 see him one time, after he had been there five weeks. He was begging to be brought home and she refused, telling him that he was crazy. She seemed to be pleased that he was incarcerated and was mentally ill. She offered to take him out of the hospital if he would turn over all his property to her and their son and would go live with his sister and never come around them again. He stated that when he was admitted to the hospital, he weighed 185 pounds and when he was released, he weighed 150 pounds. While in the hospital he wrote her several letters begging to be released.
He further testified that one time a traveling salesman was at his house and he saw him making "wiggley waggley" eyes at his wife. That was in 1949. On that occasion his wife made the proposition to him that henceforth, each would do exactly what he or she pleased and the other would ask no questions. At the time he saw the man making eyes at his wife, he was called to the telephone and before he returned he heard the salesman running down the steps. She left the house and in a little while, he got in the car and overtook her on the street and she stated that she wanted to go see this traveling salesman. She got in the car and they drove to the salesman's farm where he accused them of having an affair.
On cross-examination he stated that he married the defendant because she told him if he didn't, her father would kill him. Such was plaintiff's testimony.
The defendant testified in her behalf. She denied practically all of the testimony of her husband except she admitted giving him some medicine that produced unconsciousness and taking him to the St. Louis Hospital, and also filing proceedings to have him declared incompetent. She did this upon the advice of physicians and from her own knowledge and observation that he was of unsound mind. She had tried to give him a sedative in his ovaltine once before but didn't succeed. Before doing these acts she had also consulted her attorney about it.
She testified that prior to the time she took him to St. Louis he told her he could hire her killed for $500. In the middle of December, 1949, he asked her to change the bed clothing on one of the beds, that two Italians had slept in it. He stated that one night when he came home late, two Italians were sitting on the front porch. He threatened to shoot them and they told him they were friends of his nephew in Kansas City. He claims they sat and talked a while, asked him if they could stay all night and he gave consent. He stated they drove their automobile up into the cemetery, got some "Tommy guns" out of the car and brought them back to the bedroom. He said they disrobed all but their shorts and then practiced calisthenics by hitting each other on the chest. He stated he did not know what they were doing there but he got them up next morning and they left at 4 o'clock. At one time when plaintiff and defendant were going to Joplin, he told his wife they were going to a necktie party. When asked what he meant, he said "you will find out." One evening when they were talking, he told defendant he saw a rope hanging around her navel, but that it would soon be around her neck. At another time he told her he could see himself walking up the steps to the gas chamber in Jefferson City, that he was going to kill her but he was willing to die for it and that no man would walk to his death any steadier than he.
One morning in 1949, he insisted on defendant cashing some postal savings and upon her refusal, he knocked her down over a chair. At another time, he left in the middle of a funeral to show a shetland pony to a neighbor. One time when she was staying at her son's, he accused her of being intimate with some men, walked backward and forward talking in a loud tone, then came over to where she was sitting, grabbed her arm and tried to take her wedding and engagement rings from her finger. He continually accused her of being intimate with various men. She denied that the traveling salesman ever made eyes at her or that they were intimate in any way; that he was merely a friend of the family, but that her husband continually accused her of being intimate with the salesman. She said that her husband *630 picked her up on the street one day and forcibly took her to the salesman's home, which was several miles away. In her presence he told the salesman that he had brought him his future wife and then accused him of making eyes at her. She denied asking to go to the salesman's home.
At another time, he got her in the car, started out the highway, threatened to take her to the salesman's farm, she jumped out of the car, escaped and got to a telephone and called her brother in Carthage, who came and got her. At another time in a jealous rage, she said her husband whipped her from the garage to the house with a big whip. She said her husband had accused her of being familiar with seven men, naming them. At another time, he apologized for his conduct, asked her not to leave him and said if she would come back, he would try hard to improve. Later he told her he wasn't going to try to be good any more. One evening when defendant had been out to a club meeting, a lady brought her home. Her husband got very suspicious and threatened her with a pistol. At another time he went up to his son's house where defendant was staying and tore the latch off the screen door to get in the house. One morning he was accusing her of being familiar with certain men and accusing her of stealing his money. He became very agitated, went over to a table and obtained a pistol and started toward her. She told him not to do that, ran in the kitchen and returned with the butcher knife. She was dressed except for shoes and stockings. She sat down on the bed and cut two holes in the mattress. He was only three or four feet away from her. She did not attempt to cut him, although she could have touched him with the knife. He accused her of trying to poison him and claimed she kept sandwiches in the ice box with poison in them. One evening while they were sitting at home, he asked her where she wanted to be buried. She told him she had not given it much thought. He said, "You better be thinking about it, better be selecting a place because you're sure going to need one before long."
At another time he threatened to kill Max, their son, and his family with his bare hands. Defendant denied ever trying to poison him or ever giving him any bichloride of mercury tablets. Once, when defendant had gone to bed one evening, plaintiff came in, circled the bed several times and told her he was going to kill her with a chair. She ran all the way up to her son's house without any shoes or stockings on. This happened about 4 or 5 o'clock in the morning. She testified she had talked to her husband weeks before she took him to St. Louis, trying to get him to go to some physician or clinic. She went to Dr. Hansell, her husband's regular physician, told him some of the things her husband had been doing or saying and asked his advice. He told her she had better see a neurologist. She was advised to see Dr. Andrew Jones in St. Louis and was advised to get her husband into a hospital. Then one day Dr. White of Springfield called her and told her Dr. Jones had called him and told him her husband should be hospitalized and he would give her some medicine to give him, so she got the medicine on the Doctor's prescription, administered it to her husband in the ovaltine, he became unconscious and she procured an ambulance and a nurse and Dr. White came along to Mt. Vernon. Her husband was placed in the ambulance and taken to the hospital. On the way, her husband was given a sedative hypodermically when he showed indications of regaining consciousness. After she got him in the hospital in St. Louis, she was advised by the Doctors not to visit him and she did not visit him but one time during the 69 days he was incarcerated.
She testified that all she did about her husband's condition was in good faith and in an honest endeavor to cure him of his illness. That she thought he was mentally ill and irresponsible.
From the foregoing statement of the testimony of the plaintiff and defendant, it will be seen that it is conflicting and irreconcilable. We have not delineated all the charges and counter-charges, many of which referred to occurrences years ago. If plaintiff's testimony was true, he had suffered many grievous indignities. If defendant's testimony was true, and plaintiff *631 was not insane, she was entitled to a divorce because of plaintiff's misconduct. Much of the testimony of each could have been objected to as being confidential communications between husband and wife. Chamberlain v. Chamberlain, Mo.App., 230 S.W.2d 184. Reeve v. Reeve, Mo.App., 160 S.W.2d 804. This was waived by failure to timely object.
Lela Rhodes, a witness for plaintiff and who frankly admitted her dislike for defendant, testified that she worked in the Fossett household from 1933 until 1949; that she did the cooking, washing, ironing, cleaning, fixing the ambulance cots, helped uncrate caskets, in fact, did a man's work as well as a woman's. That she went to the Fossett home to work when Mrs. Fossett had the job with the C.W.A. Mrs. Fossett worked at this job from early morning until late at night, but witness could not remember how many years she had it. Witness's room in the Fossett apartment adjoined the bedroom of plaintiff and defendant; during all the time she stayed with the Fossetts, plaintiff was kind and considerate to his family, was nice to them and she had never heard him use profane language at all. She stated that defendant was terribly mean and overbearing; that this attitude commenced three or four years prior to her testimony. That she was quarrelsome and fussy about everything; that she could frequently at night hear quarreling in the Fossett bedroom and she could hear defendant talking loudly. That defendant was critical about the conduct of the funeral home and criticized plaintiff's association with a neighbor woman; that she would argue with anybody about anything and was continually repeating scandal and gossip and was always fussing about the employees in the Post Office. Witness had heard defendant testify in the insanity hearing that she (witness) was intimate with plaintiff and that this statement was false; that for the last few years, defendant was seldom in a good humor, and she came home angry practically every evening. When she could hear defendant and plaintiff quarreling in their bedroom, defendant was the one that talked loudly but she could not understand what was said. She testified that she had heard defendant use profanity toward her husband. She knew an old revolver had been around the house for years and though she regularly made the beds, she had never seen it under the plaintiff's pillow. It was usually kept in a drawer of a table near the bed or in the closet on a shelf. She had never seen plaintiff with it. Defendant had never made any complaint to her or told her of any mistreatment by plaintiff. One night when plaintiff and defendant were fussing, witness saw defendant come running from the kitchen with a butcher knife in her hand. Plaintiff immediately left the premises.
Bina Shelton, testifying for plaintiff, stated she began working for the Fossett Funeral and Undertaking Company in September, 1949. She was hired by plaintiff, was a bookkeeper and did some selling. She testified that she never knew of defendant using her own money to purchase things for herself or for the household except a few times and she was reimbursed for most of that from the store account. After defendant returned from St. Louis and while her husband was in the hospital there, defendant told witness that he was a paranoiac and was in the hospital for a check-up. This witness further testified that while she was working for plaintiff, she never did hear him quarreling with his wife or son.
Elisa Paul worked for the Fossetts one or two days each week for the preceding six years. She testified that plaintiff complained to her of his wife's conduct with the salesman, was angry, paced the floor and said there "would be a trial before this was over." This information was imparted to defendant before she had plaintiff taken to St. Louis. Between July and December, 1949, while defendant left home, she saw a pistol under plaintiff's pillow on the bed. At another time plaintiff had a screw-driver stuck in the key hole, as he said, to keep the "boogers" out.
Dr. Andrew B. Jones, testifying for the defendant after qualifying as a specialist on nervous and mental diseases, testified that he first met the defendant February *632 24, 1950, and that she told him many things about her husband's conduct; that from what she told him, it was his opinion that plaintiff needed hospitalization. The Doctor then testified that he talked to the plaintiff in person on March 5, March 27, April 3, April 11, April 26, April 29 and May 8. He testified: "We did physical examination, cerebrological, neurological, and observed him for a time before any definite opinion was reached." His opinion was, after examining plaintiff on March 5th, that plaintiff needed further observation and examination. After all of the examinations, the Doctor was of the belief "that he is suffering from a mental illness known as paranoia." Defining paranoia, the Doctor said: "That's a mental aberration characterized by delusions against someone, which embraces many subjects. Sometimes it is a question of being persecuted, often times it is a question of infidelity on the mate; a very common sort is that in which the patient becomes more or less sexually inactive and then begins to think that the mate is playing around with somebody else and suspects many people, and any little expression or nod or eyes made or passing someone in the house is interpreted that they are having some sort of an affair. Not all paranoiacs have ideas of jealousy, it may be of a religious tendency or may have to do with litigations. A great many paranoiacs are litigious, they delight in bringing lawsuits against various people and testing a point of law and questioning ordinances and so forth."
The Doctor recommended hospitalization. During this time he talked to defendant many times by long distance telephone and wrote his diagnosis to defendant's attorney at Carthage, Missouri. It was the Doctor's opinion that plaintiff's condition might make him harmful to others. This opinion was communicated to the defendant.
Dr. Sidney B. Maughs, a psychiatrist, testified that he examined plaintiff on April 19 and 20, 1950, and talked to him; that plaintiff among other things told of his suspicions of the alleged conduct of defendant and the salesman; and that from the witness' examination of the plaintiff and his conversation with him, he concluded that the plaintiff was suffering from a paranoiac condition and that he should be regarded as a dangerous person.
Max Fossett, the son, testified for the defendant. He stated that he had never seen the defendant act in an unkind manner toward the plaintiff. He further stated that he had observed witness Lela Rhodes being kissed by plaintiff in August, 1936; that he had heard his father accuse his mother of being familiar with several men; that in 1949 his mother came to his house about 4 o'clock in the morning barefooted. That in the summer of 1949, he had seen his father choking his mother and he separated them, that he witnessed the ring incident where his father tried to forcibly take his mother's rings; that he had noticed other peculiarities of the plaintiff; that he had heard his father threaten to kill the salesman, had also heard him threaten to cut Max Cherry's throat. He had remonstrated with his father about his conduct.
The salesman, on behalf of defendant, testified that he had never at any time misconducted himself toward her but that in July, 1949, plaintiff brought the defendant to the salesman's home and said to him, among other things, "There is your next wife" and "I have a notion to take you over here and have you married."
There was much other testimony as to the financial condition of the parties, the location and value of their property. There was also isolated corroboration of a few of the incidents herein enumerated. The transcript consists of three large volumes of nearly a thousand pages, but enough has been said about the facts to discuss the applicable principles of law.
If the conduct of plaintiff, as testified to by defendant and defendant's witnesses, was due to an existing insane condition, then such acts were not indignities upon which defendant could obtain a divorce on her cross-bill. Dunn v. Dunn, 240 Mo.App. 87, 216 S.W.2d 141. Crow v. Crow-Humphrey, 335 Mo. 636, 73 S.W.2d 807. Bethel v. Bethel, 181 Mo.App. 601, *633 164 S.W. 682. 17 Am.Jur. Divorce and Separation, Sec. 230. 27 C.J.S., Divorce, § 55. Law of Insanity, Smoot, Sec. 424. A late exhaustive and enlightening review of this question may be found in 18 A.L.R. 2d 144.
If he were in fact insane, or she in good faith thought him to be so, then her conduct in getting him to a hospital for treatment or her endeavor to have him legally declared incompetent, so he could be compelled to receive hospitalization, are not indignities upon which he could obtain a divorce. Burns v. Burns, 145 Neb. 213, 15 N.W.2d 753. Schutte v. Schutte, 90 W.Va. 787, 111 S.E. 840. Kuster v. Kuster, 37 Misc. 136, 74 N.Y.S. 853. Michels v. Michels, 120 Me. 395, 115 A. 161, 18 A.L.R. 570. Wilson v. Wilson, Mo.App., 190 S.W. 53. 17 Am.Jur. Divorce and Separation, Sec. 67. 1 Nelson, Divorce and Annulment, Sec. 6.09 and 9.06. Morland, Marriage and Divorce, Third Edition, Sec. 445. Smoot, Law of Insanity, Sec. 425. Such actions could not be cruel and abusive and amount to indignities. They would spring from kindness rather than cruelty.
The facts supporting the petition and those supporting the cross-bill are in hopeless conflict. In reading the printed record, it is practically impossible, for this court to decide which party, if either, is entitled to relief.
In divorce cases, it is the duty of this court to examine the whole record, (which we have done) and to reach our own conclusions. But where, as here, the evidence is almost in complete conflict and the determination of the case rests on the credibility of the witnesses, we must give great deference to the conclusions reached by the trial judge, who heard and observed the witnesses as they testified. He was in a much better position to judge of their credibility than are we and under those circumstances, under a long line of decisions, it is our duty to defer largely to his judgment, when supported by substantial evidence. Van Katon v. Dennis, Mo.Sup., 242 S.W.2d 21. Scheer v. Scheer, Mo.App., 238 S.W.2d 865. Wright v. Wright, Mo.App., 239 S.W.2d 765. Andris v. Andris, 343 Mo. 1162, 125 S.W.2d 38. Fite v. Fite, Mo.App., 196 S.W.2d 65. Creamer v. Bivert, 214 Mo. 473, 113 S.W. 1118. Wilson v. Wilson, Supra. Missouri Digest, Divorce,
We find ourselves in the same position as that of the writer of the opinion in Andris v. Andris, supra, [343 Mo. 1162, 125 S.W.2d 40] where it was said: "After a careful reading of the record the writer of this opinion would hesitate to enter a judgment without having the opportunity and the advantage of personally hearing and observing the witnesses. That task, however, was performed by the trial judge. It is in such cases that it is well for an appellate court to defer to the judgment and finding of the trial court."
For that reason, the judgment of the trial court should be affirmed. It is so ordered.
BLAIR, J., concurs in separate opinion.
McDOWELL, J., concurs.
BLAIR, Judge (concurring).
The writer has read the voluminous transcript of the trial record in these cases and fully concurs in the opinion of Judge VANDEVENTER. The reasons suggested by him why the judgment of the trial court should be affirmed, meet with my concurrence; but I can think of other reasons why the same result can be reached.
One cannot read the long record without coming to the conclusion that, whatever the mental condition of the husband was at the time of the trial, he was not in sound mental condition at the time he is said to have committed the acts of which the wife complained in her cross-petition.
I fully agree with Judge VANDEVENTER that neither the husband nor the wife may procure a divorce for acts committed by the other party, while such other party is of unsound mind. I fully agree that this defeats the wife's cross-petition for divorce.
But there is another reason why the application of the husband for divorce should be denied. If he was of unsound mind at the time such acts are alleged to have been committed by the wife (and I believe *634 he was then of such unsound mind), he was incapable of properly judging the acts of his wife. The tendency of the mind, in that condition, is to misjudge the acts of the other party. I believe the acts charged by the husband against the wife were largely imaginary. The testimony of one in that state of mind should be considered in that light.
The son sided with his mother. If she was guilty of the acts charged against her by the son's father, it was unnatural for the offspring of such a marriage to side intentionally with the guilty party.
The husband's application for divorce was properly denied. For these reasons, I concur fully in the affirmance of the action of the trial judge.