**Dorothy A. BROWN, Appellant,**

v.

**Tom Warren WOODERSON, and C. J. Fleetwood, Ed Fleetwood and M. E. Lomax, Copartners doing business as Fleetwood Chevrolet Company, Respondents.**

No. 48910.

Supreme Court of Missouri,

Division No. 2.

Dec. 11, 1962.

John C. Milholland, A. J. Anderson, Harrisonville, Norman O. Sanders, Kansas City, for appellant, Dorothy A. Brown. Quinn, Peebles & Hickman, Kansas City, of counsel.

William J. Burrell, Dietrich, Tyler, Davis, Burrell & Dicus, Kansas City, Rob-

ert W. Spangler, Harrisonville, for respondent Fleetwood Chevrolet Co.

LEEDY, Judge.

Action for the alleged wrongful death of plaintiff's husband, Wm. Roy Brown, who was killed when struck by a Chevrolet automobile driven by defendant Wooderson, to whom it had been lent for his personal use by the owners thereof, defendants C. J. Fleetwood, Ed Fleetwood and M. E. Lomax, copartners doing business as Fleetwood Chevrolet Company. At the close of all the evidence the court directed a verdict in favor of all of the defendants, entered judgment in conformity with the verdict returned as so directed, and plaintiff appealed.

The sole issue here is whether a submissible case was made for the jury. Plaintiff claims primary liability on the part of Wooderson, as the active tort-feasor whose negligence proximately caused her damage, and the vicarious liability of coconspirators on the part of the other defendants, the owners of the automobile, under the doctrine of imputed negligence. The conspiracy upon which the latter claim is based is allegedly the prior agreement of such owners and Wooderson for the latter to operate, for the benefit of the defendant-partners, the said Chevrolet on the public highways as a prohibitively loaned automobile displaying the defendant-partners' dealer's registration license plate in violation of § 301.250, subd. 3, RSMo 1959 and V.A.M.S. (to which revision all section references are made unless otherwise expressly noted).

■ We examine first the assignment that plaintiff made a submissible case against Wooderson. If she made no case against him, it follows that none was or could have been made against the other defendants. If she did make a case against Wooderson, but failed to make one against the other defendants, she would nevertheless be entitled to a reversal of that part of the judgment in Wooderson's favor, and to have the case remanded for a new trial as to him. Whether a submissible case was made is to be determined, of course, under the time-honored formula that the evidence is to be considered in the light most favorable to plaintiff, and that she is to be given the benefit of any and all reasonable inferences therefrom, etc., as applied (and more fully stated) in See v. Wabash R. Co., 362 Mo. 489, 493, 242 S.W.2d 15, 17; Sibert v. Boger, (Mo.) 260 S.W.2d 569, 571, and countless other cases. As thus viewed, the facts immediately surrounding the casualty (as distinguished from those in relation to the conspiracy issue which we reserve for later consideration) are, in substance and effect, these:

The casualty occurred on U. S. Highway 71 two or three miles south of Belton, Missouri, about 9:30 p. m., on April 15, 1960, as the decedent Brown, a tow truck operator employed by a Belton garage, was engaged in a tow truck operation by which he was attempting to pull back onto the paved portion of the highway a loaded sand truck which had accidentally gotten off and mired down. At the point in question the highway runs north and south. The paved portion is 24 feet in width and consists of two 12-foot lanes, one for northbound traffic and the other for southbound traffic. There are shoulders on each side. There had been an "extremely large amount of rain" that night—so much so that at a point 25 feet south of the stalled truck the highway was under water, and a mile farther south it was completely closed for that reason.

Edward Resse was the driver of the stalled truck. It was southbound, enroute to Butler, when Resse "got into high water [at least two feet deep] and got off the road * * * and mired down by the side of the road" (i. e., on the west shoulder), "the bed might have been sticking over one or two feet off the shoulder." As soon as the water receded sufficiently ("it went down fast"), Resse got out of the truck and "put out" or placed two fusees (which "light and burn a red flame") on his, the west, side of the

highway, one about 150 feet north of the stalled truck, and the other in the opposite direction "toward Harrisonville." These fusees burned about 30 minutes, but they got wet ("the water ran over them"), and a highway patrolman came by and gave Resse additional fusees which he "put out." The tow truck or wrecker, driven by Brown, was dispatched to the scene by a highway patrolman who had discovered Resse's plight. After the wrecker arrived, kerosene flares, in addition to the fusees, were also put out. The wrecker was equipped with two seven-inch flasher red lights, located at the rear outside corners of the truck. It had a six-inch red light on top, and two three-inch lights on the outside rear on the "headache rack" on top of the truck at the rear of the cab. It had a spotlight directed to the rear working area. It was also equipped with six fusees and four kerosene flares. The wrecker was there a half hour or longer in trying to "winch out" the stalled vehicle, this by fastening a chain from the rear of the tow truck to the front end of the stalled truck. Said Resse, "he hooked at two or three or four different angles and he never did get me out, and he finally pulled me in further." While Resse was unable to state positively whether lights on the wrecker were flashing, there was, nevertheless, as he put it, "plenty of light to see anything you wanted to do. * * * There was a lot of light there * * * there was all kinds of lights." The following appears in his cross-examination in that same connection: "Q. Do you actually remember for sure whether there was any fusees out at the exact time of the collision to be certain? A. I know they had to be burning. Q. Could they have burned out? A. They couldn't have burned out that quick."

Brown and Resse worked to the rear of the wrecker on the pavement. A few seconds before the collision occurred, the wrecker was almost completely covering the west half of the highway, and these men (being the only persons present at the time) were working side by side in the southbound lane, unhooking the chain, at the center rear of the wrecker, which vehicle was then "just a few feet * * * possibly four feet * * * in front of the truck, sitting kind of angling in front of the truck" with its front end "slightly across" the center line of the highway. There was room for traffic to go by the wrecker, some (northbound) having actually done so.

The following excerpts from the testimony of Resse give his version (incomplete and fragmentary, though, it is) of what next transpired, i. e., at the moment of impact: "Q. Was there anything unusual occurred as you got back there to unhook from this car? A. I don't know what happened. I never seen or heard anything. I felt something and turned around and the car [Chevrolet] was setting there smashed up and he [Brown] was gone. Q. You felt something and then you saw this car was smashed up? A. I thought something brushed me, I don't know what it was I felt, something on my sleeve. Q. Something brushed your left arm? A. Yes, sir."

When Resse turned around and saw the smashed up automobile after having felt something brush his sleeve, he found these conditions: The wrecker was off of the highway, on the east side, "at an angle over in the ditch—the front end over in the ditch off the highway"; the stalled truck was on the west shoulder; Brown's body, apparently dead, was "in front of" the witness, partly on the west shoulder and partly on the pavement. Prior to finding Brown's body, Resse had not heard any horn sounded by the car which he later found "smashed up"; the weather was "dark and rainy * * * trying to rain * * * trying to mist; wet and foggy." Resse never at any time saw the car approaching, nor to the best of his knowledge, did he hear anything before the collision.

The "smashed up" car thus referred to was the Chevrolet driven by Wooderson. Although present at the trial, Wooderson did not testify; however, portions of his

deposition were introduced by plaintiff as admissions against interest, which (on the negligence issues) were in substance and effect these: That as he drove south toward the scene of the stalled truck and the wrecker, traffic conditions were "pretty bad. Everything was all balled up that night. Lot of traffic" in both directions; that his highest speed was 30 or 35 miles per hour; that when approaching from the north (the direction from which he came), there is normally a view of the scene of the accident "say possibly 500 yards—daytime"; that during the last 1000 feet before reaching the scene, there were northbound cars passing him, the last of which passed him about 100 yards north of the scene; that he first saw the tow truck when he was not more than 50 feet from it, and at that moment there was no northbound traffic, nor did he see any other vehicle; that he saw the collision with the man at the moment it happened; and that he had had occasion to use the brakes enroute to the scene, and that they worked "all right." The Chevrolet appears to have come to rest "sort of katty wampus" in front of the stalled sand truck, but at a distance not disclosed by the record. It suffered severe front-end damage. Photographs introduced in evidence show that the front fenders, bumper, lights, grill and hood were a bent and twisted mass, and all of such parts were telescoped into that portion of the body to the rear of the windshield. Fragments of Brown's clothing were found embedded between the frames of the dual right headlights which are located at the extreme right side of the car.

Trooper Buesing of the State Highway Patrol, a witness for plaintiff, testified as follows: That as he was proceeding north along Highway 71, setting out flares where the road was under water south of the scene of the subsequent accident, he came upon the stalled sand truck; he continued his northward course along Highway 71 for a distance of about two and one-half miles to the junction of Highways 71 and 58 (the Belton turnoff) where the wrecker was working on stalled cars in that immediate area, and the witness told Brown about the stalled sand truck. He then saw Brown head south on 71 Highway with "red lights turned on the wrecker," the exact number or their location he did not remember. After the wrecker left on this mission, the witness and another highway patrolman continued to direct traffic at the intersection. They stopped cars and turned back the southbound traffic on 71. As they were thus engaged, Wooderson came east on 58, and as he was turning right onto 71 (toward Harrisonville, his home), the witness "called to him to stop and he continued a little bit until I called to him again. At that time I told him that the road was closed, and he said he was going to Harrisonville." (At this time "there was a light rain or it had just almost stopped raining.") Wooderson nevertheless "continued on," and in "just a very few minutes" the witness headed south on 71 and as he approached the scene of the collision, with weather conditions remaining "about the same" as last above mentioned, he "saw the red lights were on," and he assumed they were working on the stalled truck. The witness did not recall exactly how far he could see the red lights as he approached the scene, "but for some distance." There was no visible obstruction of the scene by weather conditions, "although the rain wasn't as hard as it had been, if there was any at all," and the witness could see "the range" of his headlights shining down the road ahead of him. The witness described the conditions at the scene of the collision to be substantially as hereinabove stated with respect to the location of the several vehicles, Brown's body, etc., adding that the "driver of the 1960 Chevrolet was still sitting in the car, and several other cars had stopped." The license plate displayed on the Chevrolet was "a 1960 Missouri dealer's license, 601K." The driver, Wooderson, made this statement to the trooper at that time as to how the collision occurred: "There was a truck stalled there and I swerved to miss it and that was it." The witness reached the scene at approximately 9:43 p. m., and he estimat-

ed the collision had occurred "approximately three minutes before that."

James O. Branham, an ambulance driver, who had been assisting the patrolmen in directing traffic at the junction of Highways 58 and 71, estimated he reached the scene of the collision "around seven minutes" after receiving word of the accident from a passing motorist. He fixed the location of the vehicles involved in the collision as heretofore described, and stated that Brown "was lying with his head to the west in the mud on the side of the highway * * * his right leg almost completely cut off"; that as he came upon the scene he observed that the red blinker lights on the wrecker were operating, and that there were flares on the right-hand side of the road both north and south of the scene of the accident.

Although the photographs show some damage to the rear end of the tow truck—and obviously this was the point of contact —it is difficult, if not impossible, to determine from such photographs the precise point on the rear end of the tow truck at which the Chevrolet struck or collided with it. The hitch at the rear center was damaged, a housing on the rear end sprung, and the drive shaft and transmission broken loose. The fan was jammed into the radiator and the motor mounts broken loose, but this was ascribed to the fact that when the tow truck was knocked across the highway its front end struck the embankment of the ditch on the east side of the highway.

■ On these facts we are of the opinion, and accordingly hold that plaintiff made a submissible case against Wooderson. The Chevrolet was equipped with dual headlights, and under the statute, § 304.350, the uppermost distribution of light or composite beam thereof is required to be "so aimed and of such intensity as to reveal persons and vehicles at a distance of at least three hundred and fifty feet ahead," and as to the lowermost such statutory required distance is that "of at least one hundred feet ahead. * * *" In the absence of evidence to the contrary (and there is none

before us), it will be presumed that the Chevrolet Wooderson was driving met these minimum standards. Peterson v. Tiona, (Mo.) 292 S.W.2d 581, 583.

The jury could have reasonably found that not only were the wrecker and highway well illuminated, but there were conspicuous kerosene flares and fusees burning both north and south of the tow truck operation; that the view from the north, the direction from which Wooderson approached, was unobstructed either by physical objects or weather conditions for a distance of 1500 feet, and that his brakes were in good working order. Notwithstanding all of this, Wooderson gave no signal or warning of his approach, and, indeed, by his own admission, he did not see the wrecker until he was within 50 feet of it, and even then he did not see the stalled sand truck. He saw the collision with Brown, but only at the moment it happened. He neither swerved nor stopped. There being no oncoming traffic from the south, he could have swerved to the left and into the northbound lane and thereby have passed to the east of the wrecker, as northbound traffic had done previously. It is also fairly inferable from the location of fragments of Brown's clothing found imbedded between the frames of the right dual headlights that his position when struck was well to the driver's (Wooderson's) extreme right (being within the path of the oncoming car by only a matter of inches—a half a step to the west and the victim would have been in the clear). This circumstance, when taken in connection with Resse's testimony that he heard or saw nothing of the Chevrolet immediately before the collision, would support the inference that Brown, too, was oblivious, so that by Wooderson swerving only slightly to the left, or by sounding a warning of his approach, the jury would have been warranted in finding the collision, and the resulting death of Brown thereby, could have been avoided.

■ Our conclusion is that the jury might reasonably have found that Wooder-

son, in the exercise of the highest degree of care, should have seen the warnings of danger ahead when he was yet far enough away to take any of several effective evasive actions, and thereby have avoided the collision. Compare Van Sickel v. F. M. Stamper Co., (Mo.App.) 198 S.W.2d 539 (where the parties to the action were reversed). The plaintiff there was the widow of a motorist who was killed when his car ran into or collided with the rear end of a truck parked partially on the highway at night. The controlling facts were so closely analogous to those surrounding the casualty in the case at bar as to make them practically identical. There the deceased motorist was held guilty of contributory negligence as a matter of law, precluding recovery. By parity of reasoning, it must be, and it is, held that plaintiff made a submissible case against Wooderson on these charges of negligence as alleged in the petition: In failing to keep a lookout; in failing to swerve, in failing to stop, and in failing to sound a warning of his approach.

The holding just made necessitates the further determination of whether a submissible case was also made against the other defendants, who are C. J. Fleetwood, Ed Fleetwood and M. E. Lomax, copartners doing business as Fleetwood Chevrolet Company, and hereinafter referred to as "defendant-partners" or merely as "Fleetwood." Consideration of plaintiff's claim that they are liable for Wooderson's negligence solely by imputation of law requires a brief statement of the nature of, and the facts surrounding the allegedly illegal conspiracy upon which such claim is based; but before making that recitation we note that on this branch of her case plaintiff's principal reliance is on Wooldridge et al. v. Scott County Milling Co., et al., (Mo.App.) 102 S.W.2d

958, and it is obvious that her petition was framed to bring it within the purview of that case. The Wooldridge case was an action for personal injuries arising from the negligent operation of a truck in which there was proof of a conspiracy between the driver of the truck, a shipper (the milling company) and the truck owner to violate the statutes and rules and regulations of the Public Service Commission by operating said truck in hauling the milling company's products without the required permit. The holding was that the conspirators were jointly and severally liable for damages and injuries caused by the driver's negligent operation of the truck while the conspiracy was being carried out.

In the case at bar, the petition charged that the defendant-partners did "wrongfully, fraudulently and in violation of law, agree, combine and conspire together with defendant Wooderson and with each other (for the purpose of causing pecuniary benefits to flow directly and indirectly to defendant co-partners) to cause the above said Chevrolet automobile to be operated on the public highways of the State of Missouri, fraudulently and in violation of law without having first obtained registration plates for said Chevrolet automobile as required by law [§ 301.130, subd. 5] [1] and to fraudulently, illegally, and for the direct benefit of defendant copartners to cause said Chevrolet automobile to be operated upon the public highways of the State of Missouri as a loaned automobile, displaying the dealer's license registration plate issued to defendant copartners," in violation of the terms and provisions of § 301.250, subd. 3.[2]

The next paragraph of the petition alleged: "10. That at the time and place of the casualty abovesaid defendant Wooderson was driving, managing, operating and

---

1. § 301.130, subd. 5. "Before being operated on any highway of this state every motor vehicle or trailer shall have displayed the license plates or temporary permit issued by the director * * *."

2. § 301.250, subd. 3. "The dealer plates may be displayed on any motor vehicle

used by an employee or officer and owned by the manufacturer or dealer, but shall not be displayed on any motor vehicle or trailer hired or loaned to others or upon any regularly used service or wrecker vehicle."

controlling said Chevrolet automobile illegally and fraudulently upon U. S. Highway No. 71 without said Chevrolet automobile bearing and displaying proper and legal registration license plates and while said Chevrolet automobile, borrowed from defendant copartners and loaned by them, illegally and fraudulently bore and displayed only defendant copartners' dealers registration license plate, all as overt acts on the part of coconspirator defendant Wooderson in the furtherance of and execution of the abovesaid illegal combination agreement and conspiracy."

■ From plaintiff's point of view, the facts surrounding the conspiracy are, in summary, these: The Chevrolet car Wooderson was driving at the time and place of the casualty was owned by the defendant-partners, and it displayed their dealer's registration license plate, D601K. Wooderson lived at Harrisonville, but was employed in a grocery store at Belton. Since 1957 he had been a customer of the defendant-partners' service department, but he was not employed by them. About three days before the fatal collision Wooderson had wrecked his automobile, and thereafter Ed Fleetwood, on behalf of the partnership, personally sought out Wooderson at his place of employment and solicited and obtained from him (to the exclusion of a Harrisonville garage to which the vehicle had already been removed) the business of repairing the damaged car. As a part of that arrangement, Ed Fleetwood agreed to furnish Wooderson "a car while his was being repaired for the purpose of going to and from his home to work from Harrisonville to Belton." Fleetwood at that time kept two 1953 Chevrolets, both properly registered with standard tags (not dealer's). These were "primarily for loaning—in case customers had cars tied up in our shop for work." It "occasionally happened" that when these two cars were out, a company demonstrator displaying a dealer's tag would be loaned in their stead, the partners feeling that this "was within normal application of demonstrator automobiles." A

large sign was posted in the Fleetwood garage, and of which Wooderson had actual notice, reading as follows:

"MISSOURI LAW
(SEC. 301.250 ET AL.)

PREVENTS US FROM LOANING VEHICLES TO OUR CUS-
TOMERS

Missouri Automobile Dealers Association"

We fail to appreciate the significance of the posted sign as an aid to plaintiff's case. In the first place, the sign is an incorrect statement of the law of which it purports to give notice. The section mentioned, § 301.250, prohibits lending to others a vehicle displaying dealer's license plates, and has no reference to regularly licensed vehicles, such as the two 1953 Chevrolets mentioned above; and, insofar as charging all of the defendants, including Wooderson, with actual knowledge of the foregoing section, as urged by plaintiff, they are chargeable with such knowledge as a matter of law, wholly apart from having seen the inaccurate conclusion displayed on the sign. The plaintiff concedes there was no direct evidence of any agreement on Wooderson's part to violate said section. Indeed, there is nothing in the record to show that Wooderson knew or had reason to believe that the car he drove into the fatal collision was displaying a dealer's license plate. His only declaration concerning that element of the alleged conspiracy appears in the portion of his deposition which was offered by plaintiff and received in evidence as an admission against interest, as follows: "Q. To your knowledge, the 1960 Chevrolet was owned by the Fleetwood Chevrolet Company and had their license plates on it? A. I believe so." We agree with respondents that, contrary to appellant's contention, this statement does not show Wooderson had knowledge that a dealer's license plate was on the automobile. The quoted language is as susceptible to being interpreted as meaning regular license plates as it is to meaning dealer's license plates.

There is no contention that the alleged violation of the statute was a proximate cause of decedent's death. It was relied on exclusively for the purpose of showing an illegal concert of action on the part of all the defendants, and thus to invoke the doctrine of imputed negligence.

 The most important single fact to which plaintiff can point is that Wooderson, at the time of the casualty, was operating a motor vehicle which, during the time of his possession of it on loan, was illegally licensed; but when this fact is taken collectively with all of the other facts and circumstances hereinabove set forth on this branch of the case, the proof remains insufficient to support an inference that Wooderson had agreed, combined or conspired with the defendant-partners to do an act made unlawful by statute. Therefore, at the time of the casualty, Wooderson could not have been carrying out any conspiracy to which he was a party to commit the unlawful act charged, and therefore the defendant-partners could not be held liable for damages resulting from his negligence. See in this connection (although the relative positions of the parties are reversed), Hanson v. Dalton Coal & Materials Co., (Mo. App.) 264 S.W.2d 897, an action for personal injuries and property damage bottomed on the principle of the Wooldridge case. It was there charged, and the proof showed, that the defendant-trucker at the time of the accident was engaged in hauling the company's property in violation of certain statutes and regulations of the Public Service Commission. The evidence was examined and held insufficient to establish that the corporate defendant conspired with the trucker to so unlawfully operate his truck, and hence no liability on its part for the trucker's negligence. Because of the inevitability of the foregoing conclusion, it was deemed unnecessary to discuss the facts in relation to the alleged conspiracy having been entered into for the purpose of causing pecuniary benefits to flow to defendant-partners.

The plaintiff's evidence having made out a submissible case of actionable negligence against defendant Wooderson, the judgment on directed verdict in his favor is reversed, and the cause remanded for new trial as to him; and, for the reasons stated, the judgment in favor of the defendant-partners should be, and it is, affirmed.

All of the Judges concur.