ALBERT H. ANDRIS v. JUANITA ANDRIS, Appellant.—125 S. W. (2d) 38.

Division Two, February 21, 1939.

*Rendlen, White & Rendlen* for appellant.

*Hulse & Hulse* and *Berryman Henwood* for respondent.

WESTHUES, C.—This, a divorce case, originated in the Court of Common Pleas, Hannibal, Missouri. Plaintiff, respondent here, filed a suit seeking a divorce from his wife, who filed an answer admitting the marriage but denying the other allegations of the petition. She did not file a cross-bill. The trial court granted plaintiff a divorce and defendant appealed. The case reached the St. Louis Court of Appeals where the decree of the circuit court was reversed with directions to dismiss plaintiff's petition. One of the judges dissented and requested that the case be certified to this court because he deemed the majority opinion to be in conflict with controlling decisions of this court. The opinions of the Court of Appeals appear in 109 S. W. (2d), pages 707 to 721, inclusive. The majority as well as the minority opinion disclosed a great amount of labor and study on the part of the authors. We will not attempt to make as complete a statement of the evidence as was made by the Court of Appeals.

The parties were married May 21, 1932, and separated in March, 1933. Plaintiff at the time was sixty-four years of age and defendant thirty. Plaintiff had been married twice. He was divorced from his first wife and his second wife died a few years prior to the time he married defendant. Plaintiff had a daughter by his first marriage who had never lived with him because of differences between plaintiff and his first wife. She was married at the time plaintiff married the defendant in this case. The defendant had been married

three times. She obtained a divorce from her first husband, married the second, obtained a divorce from him and later remarried him, then secured a second divorce from this second husband. Defendant had a daughter by her first marriage who was about eight or nine years old when defendant married plaintiff. Plaintiff in his petition alleged general indignities as a ground for divorce. In substance he alleged that defendant did not marry him in good faith, or because of any love or affection for him, but solely for the purpose of getting title to his property; that the defendant so informed various parties prior to and after the marriage; that an ante-nuptial contract was signed by both parties in which they settled their property rights, but that notwithstanding this contract defendant implored plaintiff to deed his property, or a greater portion thereof, to her; that the ante-nuptial contract disappeared from a locked box kept in the home; that beginning about December 1, 1932, until the separation in March, 1933, defendant's attitude towards him, plaintiff, was vicious; that she often cursed him and applied to him vile names and epithets; that defendant was guilty of such conduct in the presence of others; that defendant accused him of stealing money from her and of acquiring his property by stealing from others; that she failed to perform her household duties.

The trial court, in its judgment, specifically found that the defendant did not marry plaintiff in good faith, but for the purpose, scheme and design of getting title to his property; that the defendant cursed and abused plaintiff in the presence of others and accused him of stealing. The majority and minority opinions of the Court of Appeals are in accord that plaintiff's evidence was sufficient to entitle him to a divorce. In the majority opinion, however, the court found, that while plaintiff may have been an injured party, yet, the evidence showed that he was not an innocent party, and therefore not entitled to a divorce. In the minority opinion the author thereof asserts that an appellate court, in circumstances as presented by the record in this case, should defer to the findings of the trial judge, who has a better opportunity to weigh the evidence and judge the credibility of the witnesses. As can be readily observed from the majority opinion of the Court of Appeals, plaintiff's witnesses were chiefly his friends, referred to in the opinion and in the record as plaintiff's cronies. We find that the most damaging evidence against plaintiff was given by witnesses who were very friendly toward defendant. That, however, is not uncommon. In divorce cases the witnesses who testify are as a rule friendly to the party in whose behalf they give testimony. The trial court evidently did not believe much of the testimony of the witnesses for the defendant. There certainly was a sharp dispute in the evidence. In such a case a court must look to sign posts, if any there are, to lead it to a correct de-

cision.. We find such in the record in this case. The defendant emphatically denied that she married plaintiff for his money, or that she attempted to persuade him to deed her his property. She testified that she signed the ante-nuptial contract at plaintiff's request a day or so before the marriage; that she was not particularly interested in the provisions of the contract. She further testified that plaintiff treated her very well until he found that the ante-nuptial contract had disappeared. Note her testimony:

"I was good to Mr. Andris until I took sick, and the contracts were missing, and he commenced abusing me, wanting me to sign the second contracts. This was the last of October or the first of November, 1932. Up to that time, Mr. Andris was good to me, and we got along fine. He stayed away from the fire department, he wouldn't go over there where those men were, didn't go over there hardly along during that time. When he stayed away from those men, people like that, we got along fine together. So far as I know, he made no complaint about me and I made none about him. He told me he had had two wives, but I was the best one of all three. To tell you the truth, he was the best man I had had up until then. I kept house and got the meals."

Plaintiff accused the defendant of having taken the contract and a duplicate thereof out of the locked box. He then obtained duplicates from his lawyer and these also disappeared. Now, if the defendant was not particularly interested in plaintiff's property, what excuse did she have for not signing duplicates of the ante-nuptial contract? Under her own testimony it was this dispute that changed a happy marital condition into a living hell. In the majority opinion of the Court of Appeals it is noted that it was not to defendant's interest to destroy the contract. We think it a matter of opinion, whether in case of plaintiff's death the property given to defendant under the ante-nuptial contract would have been worth more to the defendant than her marital rights under the statute. But plaintiff charged, and there was much evidence introduced in support thereof, that the defendant wanted the absolute title to a major portion of plaintiff's property. Defendant's refusal to sign the duplicate contract, at the risk of breaking up what she designated a happy home, supports plaintiff's theory. True, defendant's excuse for not signing duplicates was that they were not the same as the original. But Mr. Hulse, a reputable lawyer, testified that the contract had not been changed. The record does not justify a finding that the duplicates were different than the original. A number of witnesses testified that defendant made statements, both before and after the marriage, that she was going to get the plaintiff's property and that that was the reason for the marriage. These statements, if correctly related by the witnesses, were couched in such language as to leave room for only

one inference, that the marriage was to the defendant only a scheme to obtain title to plaintiff's property, and that the defendant never had any other purpose in marrying the plaintiff.

■ If defendant's marriage to plaintiff was not in good faith, but only a scheme to acquire his property, as the trial court found, then defendant was guilty of a fraud. [Steines v. Steines, 89 S. W. (2d) 520, 338 Mo. 335.] Her pretended love and affection for plaintiff, showered upon him abundantly at times in the presence of others, as noted in the opinion of the Court of Appeals, was gross hypocrisy. If that be true, then the suggestion in the minority opinion was appropriate, that is, that so long as plaintiff was innocent of the defendant's scheme he lived in a fool's paradise, but that it was a sad day for him when he awakened to the stern reality of the situation.

There was evidence, quite a volume of it, given by defendant, her mother, and one or two other witnesses, which, if true, disclosed that plaintiff, after the dispute over the loss of the ante-nuptial contract arose, cursed and abused the defendant and was unkind and unsympathetic toward her. This evidence was fully reviewed in the majority opinion of the Court of Appeals. Contra, the evidence against the defendant was fully set forth in the minority opinion. The trial court may well have found that all of this trouble would have been avoided if defendant had signed a duplicate contract to replace the one lost.

After a careful reading of the record the writer of this opinion would hesitate to enter a judgment without having the opportunity and the advantage of personally hearing and observing the witnesses. That task, however, was performed by the trial judge. It is in such cases that it is well for an appellate court to defer to the judgment and finding of the trial court. This court in Vining v. Ramage, 319 Mo. 65, 3 S. W. (2d) 712, 1. c. 722 (7), had the following to say apropos of the situation now confronting us:

"In equity cases, notwithstanding that this court has the unquestionable right to review and weigh anew the evidence, our usual practice is to defer to the findings and judgment of the trial chancellor where the evidence is conflicting, and where the findings and judgment of the trial chancellor are largely dependent upon the appearance, demeanor, and credibility of the witnesses; provided, of course, there is substantial evidence upon which to predicate such findings and judgment. [Boggess v. Boggess, 127 Mo. 305, 322, 29 S. W. 1018; Jones v. Thomas, 218 Mo. 508, 540, 117 S. W. 1177; Huffman v. Huffman, 217 Mo. 182, 191, 117 S. W. 1.]" So with due regard for the able and well-reasoned opinion of the majority of the Court of Appeals, we are constrained to defer to the finding of the trial court and affirm its judgment. It is so ordered. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES C., is adopted as the opinion of the court. All the judges concur.

## ON MOTION FOR REHEARING.

PER CURIAM:—Appellant in a motion for rehearing insists that we failed to dispose of her assignment of error, that the trial court erroneously rejected evidence offered by her tending to prove that respondent was by nature a crude, harsh, profane, vulgar, obscene, corrupt and overbearing man and that he bore such a general reputation. The record disclosed that respondent, while a witness, admitted, when questioned by appellant's attorney, that he used profane language. Note, ''I suppose I have cursed probably all my life occasionally.'' ''I expect I have used ugly and bad language on the streets in Hannibal.'' Witnesses for respondent, while on the stand, admitted that respondent possessed such traits. Had the trial court admitted the rejected evidence it would have been only cumulative of what was in the record through respondent's own admission. Appellant, however, did not object to the manner of man respondent was by nature. She testified, as related in our opinion, that respondent was the best husband she had had; that he treated her very well until the dispute arose over replacing the ante-nuptial contracts which had so mysteriously disappeared.

The trial court specifically found that appellant did not marry respondent in good faith, but only because she wanted to obtain his property; that she accused him of stealing what property he possessed. We reaffirm what we said in the opinion, that the record justified that finding of the trial court. If that be so, then appellant's whole marital affair with respondent was a fraud and indeed an indignity of the rankest sort. Appellant insists that since respondent was a man who habitually used vile and vulgar language the use of such language, by appellant, would not constitute an indignity against him. Suppose we grant that to be true. If appellant was half as proficient in the use of vulgar and profane language as the evidence of witnesses for respondent would indicate, then she too was not insulted by the use of such language in her presence. Upon further consideration we are convinced more than ever that the judgment of the trial court was justified. That judgment finds appellant to be the *innocent and injured* party. The motion for rehearing is overruled.