**Kay LANGSHAW, Plaintiff-Appellant,**

v.

**Dale A. LANGSHAW, Defendant-Respondent.**

No. 23069.

Kansas City Court of Appeals.

Missouri.

Jan. 11, 1960.

A. E. Elliott, Nevada, Mo., for appellant.

Donald B. Russell, Nevada, Mo., for respondent.

CAVE, Presiding Judge.

The plaintiff sued the defendant for divorce. Her petition alleged that they were married June 24, 1955, and continued to live together until March 29, 1959; that she discharged all her duties as the wife of defendant and treated him with kindness and affection, but the defendant, disregarding his duties as the husband, offered such indignities as to render her condition intolerable in that: "(a) Defendant has cursed and abused plaintiff and called her vile and indecent names; (b) defendant has on numerous occasions struck and beat plaintiff". There were two children born of the marriage. She prays for decree of divorce; for the care and custody of the children; and for alimony and support and maintenance of herself and children.

Defendant's answer was a general denial, except admitting the marriage and the birth of the two children.

At the conclusion of the evidence, the court announced that, in his opinion, each party was equally to blame for their marital troubles, and dismissed plaintiff's petition. She perfected her appeal, and contends that the court erred in refusing to grant her a divorce, and in rejecting certain evidence.

Only three witnesses testified: the plaintiff and her mother, and the defendant.

The parties were married June 24, 1955, and "separated for the last time March 31, 1959". There were several other separations during their rather turbulent marriage.

The defendant was a railway mail clerk traveling from Kansas City to various other metropolitan centers, and when he was on duty, worked from 60 to 80 hours per week. The incident that caused the final separation, according to plaintiff, was that the husband returned home from work one morning and asked her if she loved him, and her reply was, "No, I do not. How can a woman love a man that hits her? So he says, 'Well, I am going to give you reason to leave me.' So he hit me on the arm several times. Q. Did that happen more than once? A. Well, no, this is the only time since I went back to him. Before our little girl was born, he struck me several times, * * *. We separated and I had filed for divorce, but we went back together." The little girl was three years old at the time of the trial in May, 1959, so it is evident that the first striking occurred more than three years before the final separation. Plaintiff gave no explanation of the first striking, but did say that she left and returned to her mother, and remained away seven months before the little girl was born. She also testified that he had called her vile and indecent names.

On cross examination, she admitted that she had hit and scratched her husband on different occasions; had thrown a "beautiful vase of jonquils" at him; also had struck him on the side of the head with a "pottery rooster", and said, "It's too bad it didn't hurt him". She also testified that she had left her husband four or five different times; and on the first occasion, remained away seven months, but other separations were for only two or three weeks. The only reason she gave for leaving him was, "I thought maybe he might treat me a little bit nicer".

Plaintiff's mother testified that when her daughter came home the last time, she was a nervous wreck and had bruises on her arm "where she said he struck her just before they came down". On cross examination, she testified that she knew nothing about their trouble except what her daughter told her; and the court sustained objection because it was hearsay.

The husband testified that he was a substitute railway mail clerk and his income was approximately $6,600 a year. That when he was on duty he would work 60 to 80 hours per week. With reference to the controversy leading to the last separation, he said it started when she wanted to go to a drive-in; that he told her he didn't have much cash at that time and wanted to wait until "payday". She got mad about that and

started on about going home to her folks * * * and so we didn't go to the drive-in and she got mad and started fussing. * * * I had to go to St. Louis Sunday morning and got back Monday morning, and she was carrying on about me not wanting her cousin down there, * * * and then she threw an ash tray at me and kept arguing about it and then she threw a glass at me * * *. She threw a rooster at me and I had a cut place on my arm * * * then under those circumstances, after working so many hours, a man is going to go to pieces sooner or later * * *.

"Q. How did she get the bruises on her arm? A. Well, she got most of those—she was throwing things at me and I was protecting the little girl, for one thing.

"Q. She had left you before a number of times, had she not? A. Yes, sir.

"Q. If you had any difficulty would she treat you like this? A. Yes, sir. Any time I would set down and want to talk about bills or something, she would get mad so I would kinda say something, too, which I guess I shouldn't of but she would kinda get mad and say, 'Well, I can go down to the folks'. It seems like whenever we had an argument that is the first thing she said."

He also testified that he had tried to effect a reconciliation with his wife; that he still loved her and the children, and had talked with two ministers in an effort to effect a reconciliation.

On cross examination, he was asked:

"Q. When was the first time you struck your wife? A. After she started hitting me.

"Q. That was just before your first child was born?" The court sustained an objection to this question because there had been a reconciliation and the parties lived together quite some time after that. The appellant complains of this action, and it will be considered hereafter.

The husband further testified:

"Q. How many times have you beat up on her since you tried to effect a reconciliation the first time? A. I didn't hit her until just before she come home. I did not hit her and beat her as she said, I didn't do that.

"Q. Do you deny striking her at all? A. I don't deny striking her at all. Under the circumstances, I just went to pieces.

"Q. Do you deny cursing her and calling her indecent names? A. I did not go too far with that. I might have said something that I didn't mean to.

"Q. What did you say to her? A. She said some abusive things to me, too.

"Q. What did you say to her? A. Well, I called her a few names, she probably told you, but not many, and I did not mean them, I just went to pieces under the circumstances. * * *

"Q. Tell the court what names you have called her. A. Well, I called her 'no good' and a few things that I shouldn't of * * *.

"Q. What did you call her now? * * A. I accused her of running around for one thing, which I shouldn't of.

"Q. You knew that was not true? A. She accused me of that.

"Q. You knew it wasn't true, didn't you? A. I have no proof that it was true and I have no proof that it wasn't true.

"Q. You charged her with that offense? A. Yes, sir, and she charged me with it too—that makes it about even."

After these parties separated the last time, the defendant resigned as railway mail clerk and moved to Nevada, where his wife and children were living with her mother. He is presently working as a carpenter and his take-home pay is about $36.50 per week. He was questioned at length about his financial circumstances, and it is clearly a hopeless situation. Practically everything they owned, including the home, automobile, refrigerator, etc.,

was purchased on credit, and the payments amount to more than his present income. No doubt he was unwise, from a financial standpoint, in resigning the excellent position he had as mail clerk, and following his wife to Nevada with the hope of reconciliation. But that was a matter for him to decide.

■ This being a divorce action, it is our duty to review all the evidence and reach our own conclusion as to the proper judgment to be entered. But great deference should be paid to the finding of the trial court, who had the parties before him and was in a much better position to judge of their credibility than is an appellate court. Cody v. Cody, Mo.App., 233 S.W. 2d 777, and Dunlap v. Dunlap, Mo.App., 255 S.W.2d 441.

■ In its judgment dismissing plaintiff's petition, the court specifically found that she "is not the innocent and injured party * * *". She contends that the court improperly tried and decided the case under Section 452.090, V.A.M.S., instead of the general divorce statute, Section 452.-010. The first section relates to ex parte divorce cases, and does require that the court be satisfied that the plaintiff is "an innocent and injured party". The second section does not incorporate that specific language, but it has been held many times that the burden is on the applicant for divorce to show that he or she is an innocent and injured party, whether it be a contested or an ex parte case. Chapman v. Chapman, Mo.App., 230 S.W.2d 149; Cody v. Cody, supra, and Simon v. Simon, Mo. Sup., 248 S.W.2d 560.

However, an "innocent and injured party" is not required to conclusively prove freedom from all fault, or such exemplary conduct as excludes any misconduct or all unwise or uncalled-for acts. He or she need show only that, under all the circumstances of a particular case, he or she has not been guilty of conduct constituting a ground or grounds for divorce under Section 452.010. Simon v. Simon, supra; Politte v. Politte, Mo.App., 230 S.W.2d 142, 148(4).

■ In the instant case, the trial court found that the plaintiff was not the innocent and injured party. It is perfectly apparent that each party was guilty of conduct which would constitute statutory grounds for divorce. In the early case of Hoffman v. Hoffman, 43 Mo. 547, at page 549, it is said: "If both parties have a right to divorce, neither party has". This case has been cited many times, and most recently in Chapman v. Chapman, supra; and Cody v. Cody, supra. Even in this modern era of great liberality in severing the bonds of matrimony, a divorce is not to be granted for the mere asking.

■ This is a case in which we feel called upon to follow the decision of the trial court. He observed the parties, and could observe their demeanor and evaluate the testimony of each. The language of Judge Westhues in Andris v. Andris, 343 Mo. 1162, 125 S.W.2d 38, tersely expresses our conclusion in the instant case. He said (125 S.W.2d at page 40): "After a careful reading of the record the writer of this opinion would hesitate to enter a judgment without having the opportunity and the advantage of personally hearing and observing the witnesses. That task, however, was performed by the trial judge. It is in such cases that it is well for an appellate court to defer to the judgment and finding of the trial court."

■ Plaintiff also contends that the court erred in sustaining an objection to the cross examination of the defendant relative to the first striking about which the plaintiff testified. She contends that the reconciliation thereafter was only a conditional condonation, and if the same indignity occurred later on, the original grievance would be revived, and could be inquired into. It is unnecessary to discuss the rule of law of condonation; because the plaintiff testified, without objection, to the orig-

inal grievance, and the defendant, in other portions of his testimony, admitted that he had struck the plaintiff. We will accept that as a fact, but it does not change our conclusion when all the evidence is considered.

The judgment is affirmed.

All concur.