Andrew S. PFEIFFER, Respondent,

v.

Elizabeth PFEIFFER, Appellant.

No. 48854.

Supreme Court of Missouri,

Division No. 2.

March 12, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied April 9, 1962.

R. M. Gifford, Green City, for appellant.

L. E. Atherton, Milan, for respondent.

BARRETT, Commissioner.

The general purpose of this phase of this proceeding by Andrew S. Pfeiffer is to secure a declaration that his divorced wife, Elizabeth, has no interest in certain real property. Specifically it is a suit to set aside a deed from Andrew to Andrew and his then wife as tenants by the entirety. Originally, in January 1960, the action was one for a divorce, but by an amended petition in March 1960 there were three counts, (1) for a divorce, (2) to set aside the deed, and (3) an alternative count for partition in the event it was decreed that the parties were tenants in common. The divorce suit was tried first in March 1960 and Andrew was granted a divorce. In February 1961 this phase of the proceeding was tried and the trial court found that "the allegations contained in plaintiff's petition are true," and, therefore, that the deed "should be set aside and for naught held." The court accordingly set the deed aside and the divorced wife, Elizabeth, has appealed.

The following are the general circumstances in which this litigation arose. After some forty years of marriage and living on a 202½ acre farm in Sullivan County, Andrew's first wife, Lula, died June 3, 1957. It does not appear just where Elizabeth lived, but she had known Andrew for sixteen years and had been twice married and divorced. After his first wife's death and a courtship of three or four months Andrew and Elizabeth were married on November 4, 1957, and thereafter lived on the farm until their separation and the filing of the divorce suit in January 1960. As grounds for divorce Andrew alleged "general indignities," that Elizabeth spent money recklessly, that since December 1959 and over his protests she "insisted on keeping a young man there," that she called him vile, vulgar and obscene names, and by her actions made him "the laughing stock of his friends and acquaintances." Elizabeth was present in court with her lawyer when the divorce action was heard but offered no evidence. The court found that Andrew was the innocent and injured party and granted him a divorce "on the grounds set forth in his petition."

The second count of the petition, with which the court is immediately concerned, stated that on December 30, 1958, he had conveyed the farm to Elizabeth and himself as tenants by the entirety. He alleged that shortly after the marriage Elizabeth began to insist, since he had no children and they "were going to live together the rest of their lives," that the land should be conveyed so that an estate by the entirety would exist in them. He alleges that "said statements and representations were made many times by defendant to plaintiff" and that plaintiff "finally relying on the fact that they would always live together" accordingly executed the deed. He alleged that Elizabeth had caused him to give her large sums of money and had induced him to borrow large sums of money "on the real estate" which, he said, she had converted to her own use or dissipated. And finally, he charged that immediately after the execution of the deed she "began a studied course of action to bring about a separation of the parties, with the intent on her part to thus acquire an interest in said lands and to cause plaintiff to separate from her," all of which culminated in a divorce. Then he says, "That at no time did defendant ever intend to live with plaintiff until his death but said induce-

ments were made with the intention only of mulcting this plaintiff and with no intention to live with him." For these reasons Andrew prayed the court to ascertain and determine "the right, title and interest of the parties" in the farm.

It should be carefully noted that Andrew does not allege that Elizabeth by fraud and false representations induced him to enter into the marriage (Turner v. Turner, 44 Mo. 535), he alleges that shortly after they were married she made the representations and induced the conveyance. The respective ages of the parties does not appear, they apparently attached no significance to the fact, but from the fact that Andrew had married and lived on the farm for forty years it is assumed that he is about sixty. In any event, this is not a claimed instance of a predatory young woman preying upon a senile old man and exerting undue influence or in bad faith initially entering into the marriage for the purpose of securing the conveyance. Andris v. Andris, 343 Mo. 1162, 125 S.W.2d 38; Lins v. Lenhardt, 127 Mo. 271, 29 S.W. 1025. Futhermore, this action does not involve an antenuptial contract (Leavy v. Cook, 171 Mo. 292, 71 S.W. 182), and, admittedly, the property is not homestead or a statutory allowance (V.A.M.S. § 474.-140), and Elizabeth is not claiming any property "by virtue of the marriage." V.A.M.S. § 452.090; Coleman v. Coleman, 147 Ky. 383, 144 S.W. 1, 39 L.R.A., N.S., 193; Saunders v. Saunders, 144 Mo. 482, 46 S.W. 428. And, Andrew does not charge Elizabeth with adultery, nor with conspiring with and eloping with a paramour after the conveyance. Turner v. Turner, supra; Thomas v. Thomas, 27 Okl. 784, 109 P. 825, 35 L.R.A.,N.S., 124. Nevertheless it is assumed that the petition states a claim upon which relief can be granted and that the theory of the action is some form of marital misconduct, misrepresentation of intention and fraud. Culbertson v. Young, 86 Mo.App. 277; Sims v. Sims, 101 Mo.App. 407, 74 S.W. 449;

Steines v. Steines, 338 Mo. 335, 89 S. W.2d 520; annotation 29 A.L.R. 198.

Returning to the allegation with respect to money, Andrew does not seek a money judgment but claims that as a part of her intention with respect to the land she induced him to give her large sums or caused him to spend large sums and finally encumber the property. Within two months of the marriage she wanted to write checks. Andrew's response was, " 'That's all right.' I says, 'I'll go and make a joint bank account,' and that's what I did," and she wrote checks "the same as I did." Before his marriage to Elizabeth Andrew owed $3500, he had $500 in the bank, 1000 bushels of corn, 1200 bales of hay, sheep, cattle and horses. When he filed the divorce suit two years later he had an equal amount of feed and livestock but his indebtedness had increased $7500 and he owed $11,000. Once, in discussing finances, he recounted, "Well, I said, 'How much more do you want?' I says, 'You have already got me broke.' She says, 'Goddamn, you! I aim to break you!' "

It is not necessary to detail Andrew's testimony with respect to finances, there were some small items but there is no proof that Elizabeth wrote checks for large sums for her personal use. It turned out that the $7500 indebtedness consisted of $1500 for repairing and shingling the house, $1000 for a bathroom, $200 for furniture, $165 for a deepfreeze, $75 for his hospitalization, $215 for a cow and numerous items of farm machinery. As to some of these latter items, for example a hay baler, Andrew said, "I still owe for it. Good God Almighty! Don't poke them things on me. I still owe for it." However, as to repairing the house, the bathroom, and the furniture, he repeatedly testified that they talked these matters over and mutually agreed to the expenditures. Usually he put it this way, "I said, 'If we aim to live together the rest of our lives,' I said, 'I don't care about the furniture in the house.'

I said, 'Just get whatever you want to.'" He always concluded, "I didn't object to a thing until she brought Hopper (the young man) there in my house and kept him. That's the only objection ever I made to her and she'll tell you the same thing."

When she was served with the divorce petition and left the farm Andrew claims that he gave her $100. But Elizabeth says, "I did not take anything but a few clothes, and a few personal things." She says that Andrew refused to give her any sum, but they had spent $50 of her mother's money to buy Andrew a new suit and finally he gave her $50 and "that's all the money I had when I left." And aside from his agreeing to the expenditures, when the indebtedness grew from $3500 to $11,000 and it became necessary to borrow money from the bank in 1960, both Andrew and Elizabeth signed the note and executed the deed of trust encumbering the farm. There is no evidence that she "converted" large sums to her own use, and it is not apparent how the incurring of the $11,000 indebtedness, for which she too is obligated, benefited her personally or furthered her alleged intention of securing to herself an interest in the farm.

As to the deed to the plaintiff and the defendant as tenants by the entirety, Elizabeth says that there was casual discussion of it before the marriage. But Andrew says, "it was about eight months after we was married, she begin on the land then. * * * She said that we neither one have got no kids and said the thing to do, would be to make a joint deed out of it. Well, I said, 'If you still feel that way—' and she said, 'We're going to live together all the rest of our lives, till one of us dies.' She said that time and again. 'Well,' I said, 'if you still feel that way,' I said, 'I think two parties ought to be that way.' 'Well,' she said, 'We've got to live together,' and I said, 'Well, we'll go, and' I said, 'make a joint deed out of it,' and we took out one day and come up here to Lehman Atherton's office and she had the deed in her pocketbook— * * * (T)he 30th day of December in '58, is when we made the deed." And, another reason for the "joint deed" was to save probate expenses to the survivor. In any event, they went to Andrew's lawyer in Milan and discussed all these matters with him, including, to quote the lawyer, "that you were going to live together the rest of your life." The lawyer drafted the deed, a general warranty deed, the only unusual clause being the insertion of "It is the intention of the grantors to vest title to the above lands in grantees as an estate by the entirety." The other unusual feature of the deed was that Andrew and Elizabeth were both made grantors as well as grantees, and both of them executed the deed, and the lawyer personally acknowledged the execution. Andrew took the deed and went alone to the courthouse and recorded it. That was on December 30, 1958, one year, one month, and twenty-six days after the marriage on November 4, 1957.

But Andrew claims that to secure the conveyance Elizabeth "represented that they would always live together" when in fact she had no such intention when she married him. He argues that by reason of the representation or understanding "there was a condition attached to the conveyance," that the condition was not performed due to her fault and therefore there was not a completed gift of the land. He asserts that she did not in good faith enter into the marriage, that she had no intention of keeping her marriage vows and married him for the sole purpose of obtaining his property and is, therefore, guilty of such fraud as entitles him to have the conveyance set aside. The circumstances upon which he relies to establish all these claims developed or came about after a young man named Cecil Hopper came to the farm on October 6, 1959, and stayed until his parole was revoked and he was placed in jail on January 20, 1960. As Andrew repeatedly said, "I didn't object to a thing until she brought Hopper there in my house and kept him. That's the only objection

ever I made to her and she'll tell you the same thing." Until Hopper came "I would say we got along as good as any man and woman did."

Cecil Hopper was "going on twenty-one," according to Andrew, "He was plenty old." He was on probation involving a motor vehicle offense, and Elizabeth said, "he was a young boy and I felt sorry for him—I think we both felt very sorry for him and we tried to help him all we could, because he didn't have a home and he was —well we felt very sorry for him." The circumstances of Hopper's coming to the Pfeiffer farm were that in October 1959 Andrew bought some fence posts from him. It turned out that he had stolen the posts from his uncle and when confronted with the fact "wanted to work them out, and I let him work them out." But says Andrew, "And then after I got done with him, I couldn't get rid of him and she wouldn't let me get rid of him." They would argue about Hopper's leaving and she would say, "As long as I've got a home, he's got one." Andrew complained that she spent money on him, and Elizabeth conceded that she "bought him a second-handed coat off of the neighbor," and she bought him a pair of Western boots that he "had already paid down on." And, after their separation, while Andrew was on a trip, and after Hopper's parole was revoked and he was in jail, she sent him, by Andrew's nephew, either $2.50 or $5 for "some chewin." But, it was after Hopper came on the scene that they had serious difficulty, in the course of one argument Elizabeth threatened Andrew with a flashlight, and once she hit him over the head with a broom: "If I hadn't been setting down, she would have knocked me down. She darned near knocked my right eye out." He says that he struck her but "One time, and I never struck her then. I just slapped her off of me. She was hammering on me with her fists." He said, "I don't know whether I bloodied her nose or not. I should have bloodied her nose, I'll say that."

The climax came in December, Andrew had been cutting wood and came in the house for a drink and there was Elizabeth, "In there in bed, and Hopper was laying right down over her. She can't deny that." Andrew's reaction was, " 'I'll be Goddamned!' and I turned around and walked out of the room and went in there and set down. He never even raised up when I went in there." Elizabeth's version of this episode was that she had a bad migraine headache and was lying in the guest room fully clothed with all the doors open, Hopper "had just come in," and she asked him to bring her an aspirin and a glass of water ("if it had been Mr. Pfeiffer who had come in, he would have been the one I would have asked for the water and the aspirin tablet"). As Hopper handed her the water and aspirin Andrew came in and, according to her, said "to the boy," "You should be out here helping me." As to the whole episode she said, "I didn't know that he felt peeved about it or hurt in any way. He didn't say anything to me, but directly after that is when he went to his lawyer and filed for the divorce, and had his lawyer to write the letter to the Parole Officer to come and get him (Hopper)."

It was after this episode that the fights occurred, and it was in events relating to Hopper and this episode that Andrew claims to have established Elizabeth's fraud. On one occasion he told her, " 'If I've got to live with Hopper all the rest of my life to live with you,' I says, 'I ain't agoing to live with him.' " He was getting ready to leave one morning and in the ensuing argument "She called me a lying sonofabitch and she said, 'You sonofabitch! *I never aimed to live with you when I married you!*' " Even after Hopper left and was in jail Andrew couldn't stand it, "Why, Jesus Christ! I couldn't even stay in the house, couldn't even stay around the house," and he made a trip to South Missouri. Before leaving he hired his nephew, Robert Pfeiffer, to come and do the chores and Robert brought his friend Downing along. Eliza-

beth denied the conversations but these young men testified that when Andrew returned from his trip they overheard them having an argument, started by her over Hopper. The part they remembered was, according to Downing, "Well, they was arguing and Elizabeth called him a dirty, lying sonofabitch, *and said that she didn't intend to live with him when she married him.*" Robert didn't exactly remember what the argument was about, but she called Andrew "a dirty, lying sonofabitch" and *"She said she wasn't aiming to live with him when she married him."*

This is the evidence, particularly the italicized quotations, relied on as establishing fraud, that she did not in good faith enter into the marriage and did not intend to keep her marriage vows. The respondent's principal reliance, as establishing his theory, is upon Steines v. Steines, 338 Mo. 335, 89 S.W.2d 520. But in that case, very briefly, the husband was 75 years old and his bride was 31, and the promise that she would "be a true and faithful wife" was made as they entered the courthouse to purchase the marriage license, she at the time demanding a conveyance. There the parties were married on August 10 and the deed was executed on August 12, and the opinion says, "They occupied the same room the first three nights. Defendant refused sexual intercourse," moved to another room and immediately began running around nights. On September 26 she told the plaintiff "to get out and stay out" and sue for a divorce "that he had good grounds to do so." In these circumstances the deed was set aside, and the court said, "It is clear that the marriage ceremony was a mere sham. * * * From the beginning she fraudulently contrived to obtain his property. By deceit and imposition she did so."

But in this case the deed was not executed until December 30, 1958, thirteen months after the marriage, and Andrew and Elizabeth lived together in comparative harmony for ten months after that. Regardless of what they now say, their mutual intention was manifest in what they in fact did, and they did marry and live together for twenty-six months, two years in comparative serenity, until Hopper came along. There are no express conditions or reservations in the deed, and it takes considerable imagination to now translate "that you were going to live together the rest of your life" into a condition attached to the conveyance. Compare: Platt v. Huegel, 326 Mo. 776, 32 S.W.2d 605; Lewis v. Lewis, 354 Mo. 415, 189 S.W.2d 557. Andrew purposefully and intentionally executed the deed and, in the absence of compelling circumstances to the contrary, it necessarily had the effect the law affixes to it. Ferguson v. Stokes, (Mo.) 269 S.W.2d 655. The effect of the conveyance was that it created in Andrew and Elizabeth an estate by the entirety (V.A.M.S. §§ 442.025, 442.450; Kluck v. Metsger, (Mo.) 349 S.W.2d 919), and while Andrew may have had cause for a divorce her interest in the estate by the entirety was not dependent on her good conduct nor was it affected by her subsequent misconduct. McCarty v. McCarty, (Mo.) 300 S.W.2d 394, 402; Johns v. McNabb, (Mo.) 247 S.W.2d 640, 642. That he was the innocent and injured party in the divorce action (on the ground of "general indignities") did not perforce destroy her interest in the estate by the entirety (Hiatt v. Hiatt, (Mo.) 168 S.W.2d 1087, 1091), the consequence of the divorce was that they became tenants in common. Cisel v. Cisel, 352 Mo. 1097, 1102, 180 S.W.2d 748, 750.

As indicated, the circumstances of this case are not comparable in probative force to those in Steines v. Steines, supra, and in some respects they are not as compelling as the conceded facts in Kinzey v. Kinzey, 115 Mo. 496, 22 S.W. 497, 20 L.R.A. 222, in which the court refused to set aside a conveyance from husband to wife. There the parties had lived together for fourteen years, but the husband obtained a divorce upon the allegation that his wife had com-

mitted adultery "with one John A. Catron." Essentially Andrew's theory of relief is comparable to Mr. Kinzey's. "But counsel for appellant seem to contend that this case is one calling for the interposition of a court of equity in the interest of morality, upon some theory of fraud to be deduced from the premises by reason of the confidential relations existing between husband and wife; a fraud not constructed upon the theory of any fraudulent act done or representation made by the defendant inducing the conveyance of the property to her, but simply upon a breach of the confidence that the plaintiff then had that the defendant was and would continue to be to him a faithful wife. * * * A court of equity can and will interfere to restore to a party injured property which has been obtained from him by imposition or deceit. But in this case no property was obtained from the plaintiff by imposition or deceit. He was simply mistaken in the moral worth and virtue of one of the objects of his bounty. From the consequences of such a mistake of judgment a court of equity cannot relieve him." Kinzey v. Kinzey, 115 Mo. loc. cit. 501, 502, 22 S.W. loc. cit. 498.

In short, assuming the truth of Andrew's evidence in its entirety, the circumstances are not of the cogent, compelling force necessary to set aside a deed on the theory of marital misconduct, misrepresentation of intention and fraud. Alexander v. Alexander, (Mo.App.) 44 S.W.2d 872; Cisel v. Cisel, supra; Hiatt v. Hiatt, supra; Saunders v. Saunders, supra; Kinzey v. Kinzey, supra, and 4 Maus, Probate Law & Practice, Sec. 1242, p. 443. It necessarily follows that the judgment is reversed and the cause remanded.

BOHLING, and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.