**Elizabeth Walter ROGERS, Appellant,**

**v.**

**Daniel L. ROGERS, Respondent.**

**No. 24317.**

Kansas City Court of Appeals. Missouri.

Feb. 7, 1966.

Roy K. Dietrich, Arlyn D. Haxton, Dietrich, Tyler, Davis, Burrell & Dicus, Kansas City, for appellant.

Charles L. Carr, Kansas City, Clyde E. Rogers, Fayette, for respondent.

DEW, Special Commissioner.

Plaintiff sued for divorce, custody of her children, allowance for their support and maintenance, temporary and permanent alimony and attorneys' fees and an accounting of her property and effects in the possession of the defendant. By his answer defendant challenged the sufficiency of plaintiff's residential qualifications to vest the trial court with jurisdiction of the parties. He further denied, generally, the controversial matters pleaded by the plaintiff or their signification, asked for custody of the children, made no counterplea for divorce, but pleaded his desire for a reconciliation. He admitted his liability to support the children. The court denied the plaintiff a divorce and other relief prayed for, dismissed her petition, but awarded her $750 attorneys' fees, which defendant paid at the close of the testimony. Plaintiff has appealed.

■ The evidence as to the plaintiff's residence was sufficient to support the ruling of the court sustaining its jurisdiction and the point is not raised here on appeal.

The sole ground assigned in plaintiff's petition is that the defendant has offered her such indignities as to render her condition intolerable. Although motions for temporary alimony and other relief prayed were filed, they were not called up or presented to the court for hearing and are not an issue on appeal.

Plaintiff's evidence was that as a young girl she lived in Overland Park, Kansas; that she later attended Grinnell College, Grinnell, Iowa, afterwards taking a business course enabling her to obtain employment in the office of the Atomic Energy Commission in 1955 in Albuquerque, New Mexico. There she met the defendant, then a captain at the Kirkland Air Force Base. They married in 1959, she at the age of 28, he at 32. A few months thereafter defendant was transferred to Eglin Air Force Base, Eglin, Florida. According to plaintiff, he told plaintiff he was being transferred because of personal differences within the personnel.

Plaintiff testified to incidents pleaded by her as indignities offered her by the defendant. She said that at Eglin, defendant embarrassed her by quarreling with the lady in charge of issuing furniture for the housing at the Base, after which he told the plaintiff that the lady had fainted. She testified that the defendant publicly and privately criticized her housekeeping; that on one occasion he told her that considering her premarital chastity her "dates" must have been "goons". Once, she said, when visiting neighborhood friends, she, at a late hour, referred to her sleepiness and was humiliated by defendant's remarks to the guests that he hoped she would get sleepy so that she would not pester him all night to make love to her. She said that shortly after their marriage defendant became indifferent toward her, refusing for long periods to show her any affection or even to talk to her, and when she would suggest outside advice on their marital troubles, he would tell her she should adjust herself to his moods, which he would not change, and thus to make him care for her.

Plaintiff further testified that within a year after their marriage she obtained defendant's consent to come to Kansas City for psychiatric treatments which she thought might help solve their marital troubles. After a month's treatments she returned to Eglin Base to build up defendant's ego and to regain his affection. During her stay in Kansas City she wrote several letters to defendant, expressing her deep and abiding affection for defendant, acknowledging his letters and birthday remembrance to her. Soon after her return she became pregnant with their first child, a boy.

According to plaintiff's testimony defendant became oblivious of her pain and suffering while she was expecting the birth of their child and subjected her to embarrassment in public. On one occasion, she said, at a neighborhood party, defendant suggested to a man present that he feel plaintiff's abdomen to notice movements of the unborn child. Referring to the time when it was necessary for her to go at once to the hospital for her first child delivery, defendant calmly prepared and ate a dish of cereal. Plaintiff stated that defendant often indulged in rude arguments with her friends; that he would let her lady friends return to their homes in the dark alone after their visits and often would not even turn on the lights for them. She said she wanted to have her first child baptized, but defendant refused, saying that they should wait for the child to make its own decision on the matter. Her second child, a boy, was born within two years after the first.

Plaintiff said that defendant criticized her manner of changing diapers on the children; that he complained if she seemed to show a preference for one of the children over the other if she sought to comfort either in pain or trouble. She related an incident when attending a party in a neighbor's house where the hostess had frankly asked the guests to leave early since she

was planning a trip the following morning, and defendant insisted on staying and did stay until an early hour in the morning, thus causing plaintiff much chagrin and embarrassment. She stated to the court that she would not divorce her husband for those indignities alone, which she had described, but that they should be multiplied by the hundreds. In July, 1963, plaintiff separated from defendant, returning with her father and her children to Kansas City, Missouri, where she found an apartment on Ward Parkway that would accept children.

Friends and neighbors testified to the plaintiff's good health and happy disposition before the marriage and as to her nervousness and reticence during her pregnancies and thereafter. They spoke of defendant's apparent lack of solicitude toward plaintiff's physical condition after the separation. They praised her capability as a mother of her two baby boys and as an excellent housekeeper.

The extensive testimony relative to plaintiff's substantial investments and assets in her own name will be omitted for the reasons stated later.

Testifying in his own behalf the defendant said he was a major in the United States Air Force and a veteran of the Korean war. He was questioned about the incidents pleaded and described by the plaintiff. He explained that his remark that plaintiff did no work around the house was made in a bantering "tongue-in-the-cheek" manner; that she, in fact, was such a good housekeeper that she got nervous if anything about the house was out of order; that he never criticized plaintiff about changing the babies' diapers but did say that one of the neighborhood women assisting plaintiff, changed the diapers too often and unnecessarily. He admitted saying at a friend's house one evening that he hoped plaintiff would "sleep so that she would not ask me to pester her all night long". He said that among their friends such a remark would call for a "blood look" from the wife, which he considered a compliment. He stated that plaintiff tended to panic in emergencies, and when one of the children might hurt himself, she would pick up the child and cause him to scream and call for defendant, who would take the child and quiet him down. On such occasions plaintiff would become offended. Defendant was asked to explain the charge that on one occasion at a neighborhood gathering he suggested to one of the men present that he feel of plaintiff's abdomen to prove defendant's statement that movements of the unborn child could be felt. He said, in effect, that there was much conversation there about the expected child and defendant remarked to a man present that such prenatal activity of the child could be noted, which the man seemed to doubt. Defendant said that in his exuberance over the prospect of his first child he made the suggestion which, of course, was not carried out by the other guest. Plaintiff was much embarrassed about the matter, for which defendant later apologized to her at home.

Defendant denied any neglect of plaintiff at the time of her first confinement. He said he was at all times concerned about her condition. When she and the baby returned from the hospital he assumed the duty of feeding the baby at 2:00 o'clock in the morning. Plaintiff's pain and suffering continued and defendant took her back to the hospital. The doctor found nothing unusual about her condition and she returned home. However, the continued pains were so severe that he took plaintiff again to the hospital, where the cause of her trouble was diagnosed and treated. Returning again to her home, and with the help of plaintiff's mother and later his own mother, plaintiff and the baby were cared for. While plaintiff was in the hospital, defendant called to see her every day. During such hospital confinement following the birth of the first baby he had the sole care and responsibility for it, employing a neighborhood girl to sit-in while he was absent at the hospital. Since defend-

ant's work and schedule required him to be at work at 7:00 o'clock in the morning he got his mother to help the family and she stayed four weeks.

When asked about an incident complained of by the plaintiff when defendant invited a house guest to visit them and did not first consult the plaintiff, he said the guest was a young nephew of his and his visit was enjoyed by all the family, including the plaintiff. He also denied that he pretended deafness when spoken to by the plaintiff. They discussed their moods, he said, but never did he give plaintiff the impression that she would have to live with him regardless of his moods which he would not change. As to refusing to leave a party early after the hostess had requested the guests to do so because of her plans to start early the next morning on a trip, he said the host asked him to stay longer, which he and the plaintiff did with another couple, and helped the hostess clean up the dishes. Regarding plaintiff's property and effects, he testified that he had sent them all to plaintiff as she had requested.

Defendant further testified that when he came to Kansas City on September 23, 1963, to take the plaintiff and his two children back home, she told him that she had been contemplating a divorce. She urged him to go with her to her attorney's office and that he told her that they should be able to settle their marital troubles without an attorney. The next morning at his motel, he was served with a summons in a divorce case. He called the plaintiff, who came by and urged him again to go with her to see her attorney. Defendant agreed to go, but requested plaintiff to advise the attorney that the defendant would sign no papers that would commit him. He said the attorney talked generally about the duties of a husband toward his wife.

On the witness stand defendant was asked what his present attitude was concerning the plaintiff. He answered that he realized that he loved the plaintiff

and their children very much; that he needed them and that they needed him; that he was willing to do anything possible to solve the problems of the marriage; that he would be willing to accept a selection to work for a doctor's degree which plaintiff had thought best for the family. He said he thought the children should be brought up under the influence of the family. Addressing the plaintiff from the witness chair, he said: "Betsy, I do love you and I do need you and the boys, and I hope you need me".

The defendant's father, mother and sisters testified in his behalf. They said they had not known much of the marital difficulties between the parties, and from the letters from both and their statements, they believed plaintiff and defendant were happy. They praised the plaintiff as lovable, truthful and as a good mother, and said she had never complained to them about the defendant's treatment of her. They said she was a delicate person and required much love and affection. The father admitted having remarked to plaintiff's counsel that at times defendant "can be unbearable to live with". He explained that he had reference to the "ups and downs" a father has with his sons to impress upon them the sterling qualities of manhood. He compared his remark to that of plaintiff's counsel referring to the little boys of the parties as "little demons". The lengthy examination of the defendant regarding his financial situation will likewise be omitted, as later explained.

In rebuttal plaintiff stated that during the period of treatments by her psychiatrist she wrote the affectionate letters to defendant in evidence, which were prompted by the doctor in order to build up defendant's ego and to regain his affection for her. She said she had lost her affection for the defendant and knew of nothing she could say that would make a reconciliation possible.

The court found that the plaintiff was not the innocent and injured party; that

she had not proved legal grounds for a divorce, and that she was not entitled to any of the relief prayed. The decree thereupon denied the divorce and other relief asked, dismissed plaintiff's petition with prejudice at plaintiff's cost, and allowed her $750 attorneys' fees.

The decree was handed down on December 16, 1964. On December 24, 1964, plaintiff filed her motion for judgment or for a new trial. On February 26, 1965, said motion was argued, at which time plaintiff submitted to the court an affidavit of plaintiff's psychiatrist, from whom she had received treatments during her absences from her home. The affidavit contained six pages of confidential exchanges between the doctor and plaintiff, all hearsay so far as the plaintiff's alleged statements were concerned. It also contained opinions and conclusions of the doctor therein pertaining to plaintiff's marital relations. No part of the contents was available to the defendant for cross-examination, objections or counterproof. No order of acceptance was made on the submission of the affidavit. The defendant here objects to its consideration as a part of the evidence of record on the ground of its incompetency and inadmissibility. The defendant's counsel did join in the approval of the transcript but, as stated, the transcript does not show the admission of the affidavit or any agreement by the defendant to admit it. Under the circumstances we deem the affidavit no part of the evidence of record.

Plaintiff's first point of error is that the court erred in finding that the plaintiff did not prove grounds for divorce or that she was the innocent and injured party. Her second point is that the court erred in dismissing plaintiff's suit without awarding her judgment for her expenditures for the support and maintenance of her minor children. The two points are so interrelated that we think it proper to consider them together.

It is our conclusion that plaintiff's right to recover in the instant case for money expended by her for the support and maintenance of her children since separation, depends first upon the granting to her of a decree of divorce therein. Section 452.070, RSMo 1959, provides that: "When a divorce shall be adjudged, the court shall make such order touching the alimony and maintenance of the wife, and the care, custody and maintenance of the children", etc. In other words, such relief as here sought for reimbursement for support and maintenance of her children is contingent upon and an adjunct to an antecedent decree of divorce. The result is, so far as the present case is concerned, that unless the trial court erred in refusing to grant the plaintiff a decree of divorce there exists no authority in the case for the court to give her judgment for her outlay for child support. Stone v. Stone, Mo.App., 393 S.W.2d 201, 205; Klenk v. Klenk, Mo.App., 282 S.W. 153, 157. What remedy, if any, she may have by common law action or otherwise, is not before us for determination. Lodahl v. Papenberg, Mo., 277 S.W.2d 548, 551.

Turning our attention to the assertion that the court erred in dismissing the plaintiff's petition for the reasons assigned in the decree, we are cognizant of several established general principles of divorce law. On appeal, as in other non-jury cases, the appellate court must review this case upon the law and the evidence as in suits of an equitable nature. The judgment of the trial court should not be set aside unless clearly erroneous, and due regard should be given to the opportunity of the trial judge to judge the credibility of the witnesses. Missouri Supreme Court Rule 73.01(d), V.A.M.R. In a divorce case the state is a party thereto and public interests must be guarded in such actions. Willis v. Willis, Mo.App., 274 S.W.2d 621, 626; Hartle v. Hartle, Mo.App., 184 S.W.2d 786, 789(3); State ex rel. Couplin v. Hostetter, Mo. in Banc., 344 Mo. 770, 129 S.W.2d 1. Divorces

are not granted for the mere asking. Langshaw v. Langshaw, Mo.App., 331 S.W.2d 15, 18.

■ The indignities necessary on which to base an action for divorce on that ground must be such as to render the life of the complaining party intolerable. Furthermore, as this court has said:

"A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation."

Thomas v. Thomas, 288 S.W.2d 689, 696, certiorari denied, 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77. See also Clemens v. Clemens, Mo., 235 S.W.2d 342, 346; Heaven v. Heaven, Mo.App., 363 S.W.2d 33; Moore v. Moore, Mo.App., 337 S.W.2d 781.

In Capps v. Capps, Mo.App., 65 S.W.2d 661, 663, it was ruled by this court that trivial quarrels and disagreements due to lack of conciliatory temper in both husband and wife were not indignities entitling divorce. " * * * a decree of divorce * * * cannot rest on one indignity * * * or, for that matter, on occasional acts or words." Price v. Price, Mo.App., 281 S.W.2d 307, 311.

■ In the case at bar very few of the alleged indignities included in the plaintiff's pleading and proof approached the gravity and character of those contemplated by the statute. Furthermore, they were not shown to constitute or demonstrate a course of behavior on defendant's part toward the plaintiff deemed requisite under the law to justify the drastic penalty of marriage dissolution. Isolated incidents of consequence equal to those complained of by the plaintiff in this case are of common occurrence in the relationship of marriage, but, under the law, do not warrant nullification of the bonds of matrimony.

The evidence herein does not tend to prove perfection or grave fault in either party, but does indicate some of the contributing facts explanatory of the complaints. It was shown that the plaintiff was a young woman of highly sensitive disposition and somewhat of an unforgiving nature and tending to exaggerate the adversities of life. The inferences are strong that the burden of her two pregnancies; the pain and suffering before and after the births of the children, and the strain of the subsequent care and concern for the babies contributed to render her more susceptible to discontent. Plaintiff's solicitude and responsibility for her two healthy baby boys, four and two years old, respectively, probably served to tax her physical and mental endurance. Through her able counsel she was given the privilege of submitting to the court all of her complaints. Under the decree, which she now resists, she yet retains her marriage, her husband, equal custody of her children, and the opportunity to regain the happy family relation so vital to all concerned.

The judgment should be affirmed. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion of DEW, Special Commissioner, is adopted as the opinion of the court and the judgment is accordingly affirmed.

All concur.