**Catherine I. PILKINTON, Plaintiff-Respondent,**

v.

**Ni PILKINTON, Defendant-Appellant.**

No. 8468.

Springfield Court of Appeals.

Missouri.

March 2, 1966.

Motion for Rehearing or to Transfer to Supreme Court Denied March 21, 1966.

Application to Transfer Denied May 9, 1966.

Ni Pilkinton, pro se.

Richard D. Moore, Newton C. Brill, West Plains, for plaintiff-respondent.

WESTHUES, Special Commissioner.

This is an action for divorce filed by plaintiff, Catherine I. Pilkinton, against her husband, Ni Pilkinton, in the Circuit Court of Howell County, Missouri. A motion to disqualify the regular judge was sustained and the Hon. Roy W. McGhee was requested to try the case which was heard on December 14, 1964. The court granted plaintiff a divorce, custody of a minor child (8 years old), and $25 per month for the support of the child. From the judgment entered, the defendant appealed to the Springfield Court of Appeals where the case was submitted on briefs on January 12, 1966.

Defendant-appellant, without the aid of counsel, filed a brief and suggestions in response to the brief of plaintiff-respondent.

In her petition for divorce, plaintiff alleged that she and the defendant were married on July 31, 1952, at Salem, Arkansas; that they separated on July 25, 1963. As grounds for divorce, plaintiff stated that the defendant assaulted plaintiff and that he was cruel and inhuman toward plaintiff and her minor children; that he often cursed and abused plaintiff and her minor children. It may be stated here that one child was born of the marriage and that plaintiff had a child at the time of the marriage, born out of wedlock. At the time of the trial, this child was 15 years old.

Defendant, acting without counsel, filed an answer and cross bill. He alleged that plaintiff had never been divorced from her first husband and therefore the marriage between plaintiff and the defendant should be annulled. The following paragraphs are taken from defendant's answer and cross bill:

"2. After about thirty days of married life plaintiff deserted defendant and with the help of crooked doctors and lawyers tried to collect $1000.00 of alimony, which she failed to get. She then came back to live with defendant. Since then she has repeatedly told defendant, 'they told me they (?) I would have to make you run me off.'

"When this plan did not work she conspired with crooked lawyers and judges to get the defendant in jail without bail so that she might make away with his property without being obliged to resort to law to get it."

Other allegations contained in defendant's answer are not material.

The following is plaintiff's evidence as to what occurred on the day of separation:

"Q Mrs. Pilkinton, when did you become separated from the defendant?

"A July 25th, 1963.

"Q Mrs. Pilkinton, will you tell the Court the circumstances that brought about that separation?

"A Yes, I sure would. We came to town to buy some groceries and he went down there to the Blue Front. We went to drink one bottle of beer apiece. We went down there to get some feed for the cows. I told him 'We'll have to have some groceries.' He said, 'How much are groceries going to cost?' I said, '$13.00.' He said, 'By God, you're not getting them.' Those are just the words he said. I said, 'Yes. This isn't for me, it is for the kids, we have to have some groceries.' He said, 'We're not going to get them.' He reached out and I turned off the truck keys, so we could not go home. He reached and picked up the car jack. That is when he hit me. When he hit me with the car jack, I hit him with the tire tool one time. He just kept on hitting and then shoved me out of the truck and tried to run over me."

Plaintiff testified that thereafter she rented a place where she and her two children lived; that defendant did not thereafter aid in the support of the family.

The evidence showed that prior to the separation the family lived about five miles from school; that trouble arose over bus transportation. It seems that the nearest point where a bus for the child's school could be reached was three miles from the Pilkinton home. However, there was a bus stop about one-half mile from the home where plaintiff's older child could get on a bus and later transfer to another bus. To do this, a fee was required for the first bus because this bus did not go to the school the child was attending. This was not satisfactory to the defendant. Plaintiff testified that thereafter defendant refused to let the child ride the bus but compelled the child to walk to school with a sign on her back. This sign was introduced in evidence. It measured about 14 inches square. Painted thereon, in letters about two inches in height, were the words, "5 Years of Walking Ten

Miles to School." Concerning this sign, plaintiff's evidence was as follows:

"Q Will you tell about this sign Mr. Pilkinton made Lillie Irene wear?

"A Yes, sir. He made her wear a sign stating she had to walk ten miles to school, 5 miles in and 5 miles out. The school has offered to come to the gate up there and pick her up, that is just half a mile from us, and he would not let her do it. He made her walk in and out to school.

\* \* \* \* \* \*

"Q Mrs. Pilkinton, will you please tell the Court by what other means the defendant was cruel to this child?

"A She would get tired of wearing the sign and she would wear it out, tear it up, or something, to try to get out of means of wearing it and he would whip her black and blue for not wearing it and make her make a new sign. He also whipped his own little child, because she was only 3 years old and he tried to make her learn her A, B, Cs, and no child will learn her A, B, Cs just in one day. He has whipped her till it was pitiful."

On cross-examination of plaintiff by Mr. Pilkinton, he asked questions but he also made statements. Note one of these:

"Q It was a matter of transportation. I would have to pay for that transportation. I have got the letter here. I want to introduce that letter to show I would have to pay for that transportation. I wouldn't let her go to another school district and transfer to West Plains District and have to pay for that transportation too. At no time this school bus ever come within half a mile of our gate."

Lillian Irene Taylor, plaintiff's older daughter who wore the sign or placard to school, was called as a witness by the defendant. She testified that defendant compelled her to wear the sign and that it embarrassed her greatly. Defendant testified that the child wore the sign willingly and claimed it did not hurt the child. On this subject, note defendant's question and the child's answer thereto:

"Q It didn't hurt you any, it didn't do you any physical harm to wear that sign, did it?

"A It didn't do any physical harm, but it sure did a lot of harm otherwise, because people looked down at me because I had it to wear."

This child, Lillian Irene Taylor, actually walked to and from school, five miles each way. A number of witnesses testified that they saw the child wearing the sign.

Defendant called a number of witnesses who were examined by the defendant. We have read the evidence of these witnesses and have not found wherein their evidence supports any of the allegations made by the defendant.

Defendant testified at length but we failed to find in his testimony any substantial evidence of conduct on the part of plaintiff which would be grounds for divorce. Plaintiff admitted striking the defendant with a tire tool claiming she did so in self defense when the defendant was striking her with a car jack.

Defendant testified that after the trouble with bus transportation he insisted the family move to town so the child could walk to school. Note his evidence:

"A \* \* \* I tried to get her mother to move to town where she would be in walking distance from the school, but she wouldn't do it. It is just as well to bring out the point, the reason she wouldn't do it was because she was married to me to make trouble for me all she could.

"THE COURT: You think that is the reason she married you, Mr. Pilkinton?

"A I think so, yes."

Defendant testified that shortly after the marriage plaintiff filed a divorce action

which was later dismissed. Note his evidence with reference to this episode:

"MR. PILKINTON: To begin with if she got a few dollars with me, when she sued for divorce the first time and that would have been all there was to it. I didn't pay off what when I seen the lawyers I had hired was working against me, trying to make me have to pay off. One of them suggested I let her come back and make up with her and let her withdraw her suit, then she wouldn't get a personal judgment against me. It was my opinion if I let her come back in a month or six weeks she would be gone again, so I let her come back and she fooled me. That went along for years, all that time she was making all the trouble she could. * * *"

Defendant continued with his version of plaintiff's conduct, telling how undercover agents work. After some time, the Court interrupted, with the following question: "Did I understand you to say that was the role of an undercover agent?" Mr. Pilkinton answered, "Yes." Defendant continued his description of plaintiff's actions comparing them to those of an undercover agent, when the Court again interrupted, asking, "Are you trying to tell us, Mr. Pilkinton, that, in your opinion, she is a Communist and has been doing Communist work during the entire time you have been married to her?" To this, he answered, "I didn't say Communist, I said undercover agent. They're all Communists if one needed to be. I said she don't know what she is doing. She has been hypnotized. She tried to create that impression with me. She told me some of things that happened. Naturally, me knowing what I do about the subject, I would just figure that is what happened, I took it for granted, that is the only reasonable explanation of everything that happened. She stayed out there and worked with me and did what people her age wouldn't do. * * *"

At another point, in telling about the first divorce case, Mr. Pilkinton said, "I introduced this last statement here because when it was brought out I was not going to pay off and give her $1000, then she went to a doctor and had him certify that she was pregnant, so the lawyer I had told me I just better pay off. He said, 'Give me $1000.00,' and I will hand it over to her to take care of everything financial and all. I am not a lawyer. I know enough to know she cannot sign away her child's rights, either born or unborn. I didn't take him up on it at all. The lawyer said to give him the $1000.00 and he would give it to her. I thought I would take her back and she would take off for another month or two and I wouldn't fool with this lawyer.

"THE COURT: But she fooled you and stayed with you quite a while?

"A That is right. * * *"

Defendant's testimony was that while he was in jail, after the separation, his wife sold some stock for which she received $900. Defendant claimed that his wife, the prosecuting attorney, and others conspired to have defendant placed in jail so they could steal his property. On questioning by the Court, defendant admitted that the stock was considered the joint property of defendant and his wife; that a bank held his note for over $300 and a chattel mortgage on the stock. When the plaintiff sold the stock, she paid the note at the bank. She testified that she used the balance to support the children and herself. The evidence does not support defendant's claim that any of his property was stolen.

Defendant stated that his wife neglected her house work and stayed with him at all times. Note his evidence when questioned by the Court:

"THE COURT: During the time you were going around, over the farm did you repair fences and cut wood and do things of that nature, and other work?

"A Yes.

"THE COURT: Did she help you with the work?

"A Yes. She went through the motions sometimes. When we were sawing wood by hand she made it as hard on me as she could.

"THE COURT: Mr. Pilkinton, pulling a cross-cut saw is kind of an art anyway?

"A I don't think so. I pulled one before I was 7 or 8 years old.

"THE COURT: But a lot of people never learn how to do that, do they?

"A I don't see why they couldn't.

"THE COURT: They probably could but there are lots in my opinion that don't know how, isn't that true?

"A I don't think that anyone has tried to do it that hasn't learned it.

"THE COURT: You mean she would kind of drag her feet a little bit on the sawing?

"A Yes.

"THE COURT: Did she help you mend fences?

"A She went every place I went and she helped me do everything I done.

"Q Did she help you feed the stock?

"A She helped me feed the stock, if we didn't have but three cows to milk, she got out and milked one of them and I milked the other two.

"THE COURT: She did that for a period of 11 or 12 years on the farm; she helped you do everything on the farm?

"A I guess, making a case for her, she was a very good helpmate. As I said, she has been an undercover agent—"

The trial judge was very patient with the defendant during the trial. While examining witnesses, the defendant often made statements of fact not in the form of questions. In presenting his side of the case, he testified to many matters not in issue in the case. Plaintiff's attorney objected. The Court's attitude may be illustrated by one of his rulings on an objection, as follows:

"THE COURT: Mr. Moore, there is no use. You are just going to have to bear with us and let him conduct his case as best we can. Although, it does violence to our rules of evidence, we will try not to prejudice anybody by doing it."

■ In a divorce case, an appellate court reviews the evidence de novo. In cases wherein the evidence is conflicting and the correct result depends on the credibility of witnesses, an appellate court defers to the findings of the trial judge who had the advantage of observing the witnesses. In this case, we are in accord with the findings of the trial court. The trial judge was justified in finding that plaintiff was the innocent and injured party; further, that it was for the best interest of the eight-year-old daughter for her to be placed in the custody of her mother. McKenzie v. McKenzie, 306 S.W. 2d 588, 1. c. 591(3–7); Sec. 452.120, RSMo.

In his brief, defendant made numerous assignments of error. In a number of these, he repeated what he had stated in his answer and in his evidence: that the prosecuting attorney, the magistrate, and certain business firms conspired to steal his property. He also charged that the trial judge acted fraudulently in the trial of the case. These assignments are wholly groundless and unsupported by evidence.

■ We shall briefly dispose of other assignments without specific reference to them as they appear in the brief. Defendant complains that plaintiff did not

prove that she had been divorced from her first husband. The evidence was that plaintiff had not been married before she married the defendant. He charges the trial court granted plaintiff a divorce on her uncorroborated evidence; that corroboration is required. The cases cited are Rankin v. Rankin, Mo.App., 17 S.W.2d 381, and Magruder v. Magruder, Mo.App., 31 S.W.2d 213. Those cases do not support defendant. A divorce may be granted on uncorroborated evidence. See Miskimen v. Miskimen, Mo.App., 344 S.W.2d 289, 1. c. 293(2). In the case before us, there was corroboration. Defendant's own witnesses testified that plaintiff's daughter wore the placard on her back as she walked to and from school. This surely was an indignity.

■ We call attention to defendant's evidence with reference to the reconciliation between the parties shortly after their first separation. Defendant testified that the reason he took plaintiff back was to save $1000. Note his statement: "I thought I would take her back and she would take off for another month or two and I wouldn't fool with this lawyer." That in itself was fraud on the part of the defendant. See Rankin v. Rankin, Mo.App., 17 S.W.2d 381, 1. c. 382(1); Andris v. Andris, 343 Mo. 1162, 125 S.W.2d 38, 1. c. 40(1).

■ Defendant asserts that the trial court should not have allowed plaintiff $25 per month for the support of the child. The evidence fully justified this allowance. In fact, defendant, in his answer and in his evidence, informed the Court he was willing to aid in the support of his child. There is no basis for his complaint.

What we have said disposes of the assignments of error pertinent to the issues before us. The decree was for the right party. The judgment of the trial court is hereby affirmed.

**PER CURIAM.**

The foregoing opinion of WESTHUES, Special Commissioner, is adopted as the opinion of this court, and the judgment for plaintiff is, in all respects, affirmed.

STONE, P. J., and RUARK, J., concur.

HOGAN, J., not participating.